PRESTON ET AL., APPELLEES, *v.* FIRST BANK OF MARIETTA, APPELLANT.

SMITH ET AL., APPELLEES, *v.* FIRST BANK OF MARIETTA, APPELLANT.

(Nos. 82 x 8 and 82 x 9—Decided October 25, 1983.)

*Mr. James H. McCauley,* for appellant.

*Mr. Randall Metcalf,* for appellees.

*Mr. David C. Morrison,* urging reversal for *amicus curiae,* Community Bankers Association of Ohio.

*Mr. Keith McNamara* and *Mr. Jeffrey D. Quayle,* urging reversal for *amicus curiae,* Ohio Bankers Association.

GREY, J. This is an appeal from the Washington County Court of Common Pleas. Plaintiffs-appellees, Gary D. Preston and Robert D. Smith, filed suit against defendant-appellant, First Bank of Marietta, challenging the bank's ability to escalate the interest rate of their home mortgages. Plaintiffs claimed the bank did not make a sufficient disclosure of the variable interest rate in its mortgages to comply with Regulation Z of the Truth-In-Lending-Act, Section 1601 *et seq.,* Title 15, U.S. Code (hereafter "TILA"). Plaintiffs further claimed the bank's failure to comply with the TILA prevents it from escalating the interest rates in their mortgages.

After a two-day trial the court took the matter under advisement. Supplemental trial briefs were filed by both sides. The trial court found the bank failed to comply with the disclosure requirements of Regulation Z and ordered the bank to recompute plaintiffs' loans at the original rate of interest.

From this decision the bank appeals, alleging three assignments of error.

"I. The trial court erred in finding that appellant failed to make sufficient disclosures under Regulation Z, Truth-In-Lending-Act (15 USC 1601) and, therefore, finding that the variable interest rate provision was unenforceable."

The record reveals the following facts. The Smiths' note, executed in 1973, was for $23,000 at eight percent interest. In 1977 the Prestons signed their note for $20,000 at nine percent interest. The last paragraph of each note is identical and states:

"It is further agreed that the holder hereof may hereafter decrease said interest rate and may also increase the rate upon giving not less than 30 days' written notice prior to the effective date of such increase by letter mailed to the last known address of the undersigned; and in the event said increase in interest is made, the undersigned hereby promise to pay the interest as computed under the rate so made. In the event of such increase of interest rate, this note may be paid in full within said notice period, at the interest rate herein originally stipulated."

Each party was given a disclosure statement when the loans were made, but neither statement made mention of the raising of interest rates. It merely recited the original terms of each loan.

On March 19, 1980, the bank sent notices to the plaintiffs of its intent to raise each party's interest rate to eleven percent, effective April 25, 1980. Around May 1, 1980, the FDIC informed the bank it had failed to comply with Regulation Z in that it did not provide plaintiffs with an additional disclosure statement. The bank provided plaintiffs with the required statement and by letter informed them their rate would increase on June 10, 1980. Plaintiffs objected, did not pay the increase and filed suit.

The bank contends it "substantially complied" with the disclosure requirements of Regulation Z, and therefore the variable interest rate clause in each note is enforceable. The bank cites *Herbst* v. *First Federal S. & L. Assn. of Madison* (C.A. 7, 1976), 538 F.2d 1279, as authority for its contention. However *Herbst* is inapplicable here.

*Herbst* dealt with a technical, *de minimis* TILA violation where the lender used the phrase "rate of interest" instead of the required "annual percentage rate." See, also, *Dixon* v. *D. H. Holmes Co.* (C.A. 5, 1978), 566 F.2d 571, where a minor change in language was held to be a mere technical violation.

Other courts have required strict compliance and use of the exact language. *Gennuso* v. *Commercial Bank & Trust Co.* (C.A. 3, 1977), 566 F.2d 437; *Grant* v. *Imperial Motors* (C.A. 5, 1976), 539 F.2d 506. Their position, *i.e.,* that Congress intended the TILA to standardize credit transactions by the use of standardized language, is set forth in *Smith* v. *No. 2 Galesburg Crown Finance Corp.* (C.A. 7, 1980), 615 F.2d 407, at 416:

"In view of the goal of standardized terminology to facilitate comparison shopping, many courts have held that the failure to use the required terminology results in a violation of TILA. It is not sufficient to attempt to comply with the spirit of TILA in order to avoid liability. Rather, strict compliance with the required disclosures and terminology is required.

"* * *

"Any misgivings which creditors may have about the technical nature of the requirements should be addressed to Congress or to the Federal Reserve Board, not to the courts."

In the case before us we do not reach the question whether mere technical violations violate TILA, *Dixey* v. *Idaho First Natl. Bank* (C.A. 9, 1982), 677 F.2d 749, because as in *Dixey* the

trial court found substantive violations of TILA. The bank here did not comply with TILA in its initial disclosure statements regarding the variable rate, nor did the re-disclosure statements comply therewith. While *Herbst, supra,* is inapplicable, *Brown* v. *Marquette S. & L. Assn.* (C.A. 7, 1982), 686 F.2d 608, is right on point. In *Brown,* as in this case, there was a failure to comply. We find no error in the trial court's decision that the bank failed to comply with the regulations.

Appellant also argues in its first assignment of error that the court granted an improper remedy in declaring the variable rate unenforceable. We shall consider this point in the third assignment of error. The first assignment of error is not well-taken and is overruled.

"II. The trial court erred in finding that the variable interest rate provision contained in appellant's promissory notes, which had been signed by all appellees, was unconscionable."

Because of the possible significance of the court's decision throughout the state, the Ohio Bankers Association and the Community Bankers Association of Ohio obtained leave to file *amicus curiae* briefs. Appellant First Bank argues that *this* variable rate mortgage is not unconscionable, and the *amici curiae* argue that variable rate mortgages are not unconscionable, *per se.*

We will first consider variable rate mortgages in general. Interest rates are, as was clearly shown in the record, no more than the price of borrowed money. The rates rise and fall, like the price of any commodity, with the ebb and flow of supply and demand.

A contract price must be definite and certain. This principle is so well established as black letter contract law that it needs no citation. Although a contract must be definite as to price, it is just as well established that parties may make a binding contract where the price is not stated exactly. Sales under R.C. 1302.18 (U.C.C. 2-305) permit open price terms, and open price contracts were accepted before the U.C.C. was adopted. *Mose Cohen & Sons Inc.* v. *Kuhr* (Ohio C.P. 1959), 171 N.E.2d 207, affirmed (Ohio App. 1960), 171 N.E.2d 216. An offer is not indefinite if the agreed price, though not specifically stated, is easily ascertainable by reference to some extrinsic standard, *e.g.,* a contract to buy stock at market price. 1 Williston on Contracts (3 Ed. 1957) 153, Section 47.

If, however, the open price terms are so vague and indefinite that one party may charge what he will while the other party must guess at his obligation, the contract is illusory and unenforceable. *Century 21* v. *McIntyre* (1980), 68 Ohio App. 2d 126 [22 O.O.3d 141]; 1 Corbin on Contracts (1950) 393, Section 95.

Based on the foregoing, we must conclude that a variable rate mortgage contract is not, *per se,* illegal or unenforceable. But variable rate mortgage contracts must be, by their own terms, sufficiently definite and certain. To be enforceable they must adopt a standard by which the parties can readily ascertain the extent of their obligation at any given time.

The variable rate clauses in the mortgages in this case are not sufficiently definite and certain. The clauses state:

"It is further agreed that the holder hereof may hereafter decrease said interest rate and may also increase the rate upon giving not less than 30 days' written notice prior to the effective date of such increase by letter mailed to the last known address of the undersigned; and in the event said increase in interest is made, the undersigned hereby promise to pay the interest as computed under the rate so made. In the event of such increase of interest rate, this note may be paid in full within said notice period, at the interest rate herein originally stipulated."

The clauses are fatally uncertain. There is no limit on what interest rate, *i.e.,* what price, the bank can charge; nor is there any limit on the price the Smiths and Prestons must pay. The bank argues it is limited by the market; that is, if the interest rate is raised to excessive levels, the mortgagors have the option of seeking new financing at a competing bank.

This argument fails on two grounds.

First, under classical contract theory, a contract indefinite at the time of its making is not binding. The fact that one party may charge whatever price he will, always permits the other party to buy elsewhere. Where one side is not bound, neither is the other side. There must be a mutuality of obligation, *i.e.,* mutually enforceable rights. *Mut. Home & Savings Assn.* v. *Welker* (App. 1941), 35 Ohio Law Abs. 566; *Doan* v. *Rogan* (1909), 79 Ohio St. 372; Austin, Mutuality of Obligation: A Multi-dimensional Doctrine for All Seasons (1969), 30 Ohio St. L. J. 61 *et seq.*

Here the bank has the right to enforce its raising of the interest rate when the price of money goes up, but the mortgagor has no right to enforce a decrease when the price goes down. Lest there be any question of this, counsel for the appellees introduced the expert testimony of two economists who said that while the prime rate and the discount rate were falling in the mid-seventies, there was no corresponding drop in appellees' mortgage rates.

The bank's argument, that its right to raise the rates is limited by the market, fails on a second ground. Most open price contracts are for commodities where there is ease of entrance into and exit from the market; that is, where one can buy in or sell out in a matter of days or even hours. Real estate mortgages are long-term transactions, and arranging them is time consuming, involving loan committees, title searches, escrows, closings, etc. The option the appellees had which was either to pay the higher rate or to refinance in thirty days is hardly reasonable.

The trial court held the variable rate clause to be unconscionable. The court, in its opinion, pointed out that the Prestons' initial obligation was $179.95 per month for three hundred months, a typical twenty-five year mortgage. The Prestons paid for seven years, five months — eighty-nine months. Were the increase imposed they would have to pay $211.01 for the remaining two hundred eleven months, a price increase of over seventeen percent. In the alternative the Prestons could continue to pay $179.95, but they would be back to paying for a term equal to the original twenty-five years, or three hundred months. This alternative seems to be a form of peonage rather than ownership of an interest in land.

The court found the contracts to be unconscionable. We believe this to be a misnomer. The contracts, if they were enforced, would be unconscionable for clearly there is no mutuality. Although the court described the contracts as unconscionable, it held them, in its opinion, to be "unenforceable because of insufficient disclosure under Reg. Z, Truth-in-Lending-Act (15 USC 1601)." We find no error in the trial court's decision. The second assignment of error is overruled.

"III. The trial court erred by ordering that the interest on all appellees' notes be computed at the rate of eight (8) per cent per annum or nine (9) per cent per annum and no other interest charges."

The trial court ordered that the mortgages be calculated at their original terms. Appellant argues that this is not a proper remedy under TILA (second assignment of error) or under Ohio law.

We reject both arguments.

Section 1640(a)(1), Title 15, U.S. Code, provides for "any actual damage" caused by the violation. The sections following contain other penalties such as costs, rescission, and attorney fees. The court elected not to allow the other

remedies, and therefore, the bank argues it cannot assess actual damage. The actual damage suffered by the appellees was in having the interest rate increased.

Appellant argues that even though it has violated Regulation Z, the contract is still enforceable, *i.e.,* the court must require the Smiths and Prestons to pay the increased rate set by the bank. But if the court were to enforce the contract, and then award the mortgagors "any actual damage," what would those damages actually be? They would be the amount of the excess interest over the original contract terms. Then, having enforced the contract to require the mortgagors to pay the excess interest, the court would grant the mortgagors actual damages equal to the sum it just ordered them to pay.

The circumstances of this procedure reflect the circuity of appellant's argument. A court may grant actual damages under Section 1640, Title 15, U.S. Code, and if, as here, the actual damage is the excess interest charge, the interests of judicial economy dictate a refusal to enforce the illegal provision.

The bank further argues that the court reformed the contract, and relied on R.C. 1302.15 which provides that a court may refuse to enforce part of a contract which is unconscionable. Since this contract is not for the sale of goods, reference to R.C. Chapter 1302 is inappropriate. Nonetheless it is a well established common-law rule that a court may refuse to uphold a part of a contract, while still enforcing the rest of it.

The syllabus in *Suesskind* v. *Wilson* (1931), 124 Ohio St. 54, states:

"Where an agreement founded on legal consideration contains several promises, or a promise to do several things, and a part only of the things to be done are illegal, the promises which can be separated, or the promise, so far as it can be separated, from the illegality, may be valid."

See, also, the discussion in 17 Ohio Jurisprudence 3d (1980) 582, Contracts, Section 131.

The court's determination to enforce the mortgages as originally agreed, and not to enforce the part which violated TILA, is entirely proper under both Section 1640, Title 15, U.S. Code, and Ohio law.

The third assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

ABELE, P.J., concurs.

STEPHENSON, J., dissents.

STEPHENSON, J., dissenting. I concur in the overruling of the first assignment of error. I would, however, sustain the second and third assignments of error, reverse, and remand for a determination of damages pursuant to Section 1640, Title 15, U.S. Code. I view as palpably erroneous, the conclusion in the majority opinion that "actual" damage is necessarily equal to the increase in the annual percentage rate since such damages, under Subsection (a)(1) of Section 1640 are recoverable only if appellees can establish a causal connection between inaccurate disclosure and their injury by demonstrating that they relied on the inaccurate disclosure and thereby were effectively prevented from obtaining better credit terms elsewhere. *McCoy* v. *Salem Mtge. Co.* (E.D. Mich. 1976), 74 F.R.D. 8, and *Vickers* v. *Home Federal S. & L. Assn. of East Rochester* (1978), 62 A.D. 2d 1171, 404 N.Y.Supp. 2d 201. If appellees cannot establish the required causal nexus, they would still be entitled to recover the statutory penalty, costs and attorney fees embodied in the statute.