T.C. Memo. 2013-94

UNITED STATES TAX COURT

ESTATE OF JOHN F. KOONS III, DECEASED, A. MANUEL ZAPATA,
PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

JOHN F. KOONS III, REVOCABLE TRUST, ESTATE OF JOHN F. KOONS III,
DECEASED, A. MANUEL ZAPATA, PERSONAL REPRESENTATIVE,
WILLIAM P. MARTIN II, A. MANUEL ZAPATA, ROBERT W. MAXWELL II,
KEVEN E. SHELL, MICHAEL S. CAUDILL, AND D. SCOTT ELLIOTT,
TRUSTEES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE,
Respondent

Docket Nos. 19771-09, 19772-09.          Filed April 8, 2013.

Jon M. Anderson, John W. Porter, and Keri D. Brown, for petitioners.

W. Robert Abramitis, John T. Lortie, and Brandon S. Cline, for respondent.

[*2] MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  On May 21, 2009, the respondent issued a notice of deficiency to the Estate of John F. Koons III, determining a deficiency in estate tax of $42,771,586.75 and a notice of deficiency to the John F. Koons III Revocable Trust, determining a deficiency in generation-skipping transfer tax of $15,899,463.13.  After petitions were filed challenging both notices of deficiency and after answers were filed, the cases were consolidated.  Amendments to the answers were filed asserting increased deficiencies.[1]  Several issues were settled by the parties as reflected in a stipulation of settled issues filed on February 9, 2011.[2]  The issues remaining to be resolved, other than computational issues, are:

---

[1]The increased deficiencies resulted from the respondent's position, reflected in the amended answers, that the value of the John F. Koons III Revocable Trust's interest in Central Investment LLC on March 3, 2005, the date of death of John F. Koons III, was $148,503,609.  In the notices of deficiency this value had been determined to be $136,462,775.64.

[2]In the stipulation of settled issues, the petitioner in docket No. 19771-09 (the case challenging the estate tax notice of deficiency) conceded an adjustment on Schedule C, Mortgages, Notes, and Cash, of $4,356.65, set forth as Adjustment (A) in the notice of deficiency.  The petitioner also conceded $221,750 of the adjustment on Schedule F, Other Miscellaneous Property, of $310,500 set forth as Adjustment (B) in the notice of deficiency; the respondent conceded the remaining $98,750 of this adjustment.
In docket No. 19772-09 (the case challenging the generation-skipping transfer tax notice of deficiency), the parties agreed that the deduction of $1.5 million on
(continued...)

**[*3]** (1)   Is the Estate of John F. Koons III entitled to a deduction of $71,419,497 of claimed interest expense on a $10,750,000 loan from CI LLC to the John F. Koons III Revocable Trust?  We hold that the interest expense is not deductible.

(2)   What is the fair market value of the John F. Koons III Revocable Trust's interest in Central Investment LLC on March 3, 2005, the date of death of John F. Koons III?  We hold that the value is $148,503,609.

---

[2](...continued)
Schedule K, Debts of the Decedent, for a life insurance policy on John F. Koons III's second former wife (Carolyn Haynes Koons) should not be included as a preresiduary gift in the calculation of estate residue for purposes of determining the generation-skipping transfer tax.

In both consolidated cases the parties agreed that the petitioners should be entitled to an additional deduction under sec. 2053 for reasonable administration expenses incurred after the filing of petitioners' Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (including, but not limited to, attorney's fees, personal representative's fees, trustee's fees, and expert witness' fees) in an amount to be substantiated by the petitioners to the respondent before a decision is entered; the petitioners agreed to submit a Form 4421, DECLARATION-- Executor's Commissions and Attorney's Fees, for respondent's review; and the parties agreed that in the event the parties are unable to reach agreement regarding this deduction before a decision is entered by the Court, the petitioners shall be entitled to present this issue to the Court for redetermination.

All references to sections are to the Internal Revenue Code of 1986, as amended.

[*4]                              FINDINGS OF FACT

The case was tried in Washington, D.C.  On the first day of trial the parties

executed a stipulation of facts.  The stipulation of facts is hereby incorporated in

these findings of fact with the exception of the portions to which respondent has

made objections that have not been overruled.  The exhibits referenced by the

stipulation of facts were offered as evidence; their admissibility has been addressed

by the Court elsewhere in the record.[3]

I.       Background

Docket No. 19771-09 concerns the Estate of John F. Koons III, Deceased

(hereinafter the "Estate").  The personal representative of the Estate is A. Manuel

Zapata (hereinafter "Zapata" or the "Personal Representative").  Zapata is the

successor personal representative to Richard W. Caudill (hereinafter "Richard

Caudill"), who was the personal representative of the Estate when the petition in

this docket was filed.  Richard Caudill was a resident of Florida at the time the

petition in this docket was filed.  Zapata is a resident of Florida and was a

---

[3]The Court has not ruled on the admissibility of (1) some portions of the
stipulation of facts, and (2) some of the exhibits offered as evidence.  None of the
materials in these two categories were cited by the parties in their proposed findings
of fact.  Nor does the Court rely on these materials in reaching its conclusions.

**[\*5]** resident of Florida when the petition was filed. At his death John F. Koons III (hereinafter "Koons" or the "decedent") was a resident of Florida.

The petitioners in docket No. 19772-09 are:

! the Estate;

! the John F. Koons III Revocable Trust (hereinafter the "Revocable Trust");

! Zapata (the successor personal representative of the Estate and a trustee of the Revocable Trust); and

! William P. Martin II, Robert W. Maxwell II, Keven E. Shell, Michael S. Caudill (hereinafter "Michael Caudill"), and D. Scott Elliott, trustees of the Revocable Trust.

The Revocable Trust's principal place of administration was in Ohio when the petition was filed. The trustees of the Revocable Trust resided in the following states when the petition was filed:

! Maxwell: Ohio;

! Zapata: Florida;

! Martin, Shell, and Michael Caudill: Ohio; and

! Elliott: Florida.

[*6] II.     Koons's Birth, Marriage, Divorce, and Death

Koons was born in Cincinnati, Ohio, in 1924. On July 19, 1947, he married Patricia Boyle Koons. They had four children, and they were divorced on April 11, 1989.

On August 25, 1990, Koons married Carolyn Haynes Koons. They were divorced on March 30, 1992, were subsequently remarried on August 25, 1993, and were divorced again on May 28, 2002.

Koons died on March 3, 2005. He was a resident of Florida at the time of his death.

Koons was survived by his four children, John F. Koons IV (born 1948; currently a resident of Florida), Deborah Koons Garcia (born 1949; currently a resident of California), James B. Koons (born 1953; currently a resident of Oregon), and Christina N. Koons (born 1959; currently a resident of Washington); seven grandchildren, Caroline Koons Forrest (born 1978), Kathleen M. Koons Peiffer (born 1980), Maura L. Koons (born 1982), Jeremy B. Koons (born 1983), Morgan N. Koons (born 1985), Nicholas Koons Baker (born 1987), and C.N.K.B. (born 1990); and two former wives, Patricia Boyle Koons and Carolyn Haynes Koons.

**[\*7]**   The valuation date of the Estate is the date of Koons's death, March 3, 2005.

III.   Chronology

In 1934 Koons's father began buying shares in the Burger Brewing Co., which owned and operated a Cincinnati brewery.  Koons himself also purchased shares in the company and eventually became its president and CEO.  Under Koons's leadership the company began bottling and distributing Pepsi soft drinks in the 1960s.  In the 1970s the company stopped brewing beer altogether and changed its name from the Burger Brewing Co. to Central Investment Corp. (hereinafter "CIC").  Diversifying its business further, it expanded into the vending-machine business.[4]

By the 1980s Koons was the largest stockholder of CIC.

In 1997 CIC got into a dispute with PepsiCo, Inc. (hereinafter "PepsiCo") about whether CIC had the exclusive right to sell Pepsi fountain syrup directly to restaurants, movie theaters, and other customers in CIC's territories.  In 1998 PepsiCo sued CIC in the U.S. District Court.  In the suit PepsiCo sought a declaratory judgment terminating CIC's perpetual exclusive agreements for the

---

[4]This is the business of selling food and drinks from vending machines.

[*8] manufacture and sale of PepsiCo beverage products in CIC's territories. CIC filed a counterclaim alleging that PepsiCo had breached the same agreements.

PepsiCo suggested to CIC that the lawsuit could be resolved if CIC left the "Pepsi-Cola system" by selling its Pepsi-Cola soft-drink business. Around March 2004 Koons was approached by the head of PepsiAmericas, Inc., the nation's second largest Pepsi-Cola bottling company (hereinafter "PAS"). PAS was an affiliate of PepsiCo. PAS proposed that CIC sell its soft-drink business to PAS as part of the settlement of the PepsiCo lawsuit.

Between March and December 2004 CIC conducted extensive negotiations with PAS and PepsiCo. At some point the negotiations were expanded to include the sale of CIC's vending-machine business.

On July 20, 2004, Koons executed a will under which he left the residue of his estate to the Revocable Trust at death. He had established the Revocable Trust in 1989.

On August 10, 2004, Central Investment LLC (hereinafter "CI LLC") was formed as a wholly owned subsidiary of CIC. In preparation for the sale of its soft-drink and vending-machine businesses to PAS, CIC planned to transfer all its other assets to CI LLC. An operating agreement for governing CI LLC was executed by CIC, which was its sole member at the time.

[*9]   On October 1, 2004, CIC began to transfer its non-soft-drink and non-vending-machine assets to CI LLC.  These transfers were completed on January 9, 2005.

In the meantime, on December 15, 2004, PAS and the shareholders of CIC executed a stock purchase agreement (hereinafter the "SPA").  The other parties to the SPA were CIC, CI LLC, and CIC Holding LLC.  CIC Holding LLC was a short-lived holding company that was created and merged out of existence in the course of CIC's sale of its soft-drink and vending-machine businesses to PAS.  When the SPA was executed, Koons owned 46.9% of the voting common stock of CIC and 51.5% of the nonvoting common stock of CIC.[5]  Two of the four Koons children held CIC shares directly.  All four children held shares indirectly through the Koons Family Trust, which had been formed on July 7, 1980.  The assets of the Koons Family Trust were divided into four shares:  Share JF for the benefit of John F. Koons, IV, Share JB for the benefit of James B. Koons, Share C for the benefit of Christina N. Koons, and Share D for the benefit of Deborah Koons Garcia.

The SPA required that CIC's non-soft-drink and non-vending-machine assets be transferred to CI LLC on or before the day before the closing.  The SPA

---

[5]These exact percentages were stipulated.

[*10] required CIC to distribute its membership interest in CI LLC to the CIC shareholders. This transfer was required to be made on the day before the closing of the SPA. The SPA also required the CIC shareholders to transfer their shares in CIC to CIC Holding LLC in exchange for proportionate membership interests in CIC Holding LLC.[6] This transfer was required to take place before the closing. The SPA required CIC Holding LLC--on the closing date--to sell all shares of CIC to PAS for approximately $340 million, plus a working capital adjustment. The SPA required the closing to occur on December 31, 2004, or on a later date, to be determined by the parties to the SPA, not later than the third business day after the fulfillment by the parties of certain obligations under the SPA, including the transfer of assets from CIC to CI LLC. As has been stipulated, a step in the process by which the sale of CIC shares was accomplished was that PepsiCo would pay $50 million to CIC to settle the lawsuit and CIC would contribute the $50 million to CI LLC. However, the $50 million payment, the $50 million contribution, and the settlement of the lawsuit are not reflected in the written terms of the SPA.

---

[6]After this step was completed, the shares of CIC would be held by CIC Holding LLC, and the membership interests in CIC Holding LLC would in turn be held by the former shareholders of CIC.

[*11] The Koons children's agreement to the sell their CIC shares was "conditioned on CI LLC's agreement to offer to redeem their interests [in CI LLC]."[7] On December 21, 2004, CI LLC issued a letter to each of the children in which it offered to redeem their membership interests. The letter stated that "this offer" was "open" only during the 90-day period following the closing of the SPA. The letter stated that if the child chose to "accept this offer" then certain enumerated "terms and conditions" applied. The third such "term[] or condition[]" consisted of multiple provisions governing the redemption price. Under these provisions the purchase price of the membership interest would be equal to the child's proportionate share of (a) the value of CI LLC's assets, minus (b) CI LLC's liabilities. The value of CI LLC's assets was required to be determined through the following procedure:

- ! CI LLC would propose to the child (and each of the other three Koons children) a value for CI LLC's assets;

- ! if the majority of children who accepted the offer disagreed with the proposed value, CI LLC would hire an appraiser to determine the value of the assets;

---

[7]The stipulation states: "On or about December 15, 2004, the Koons children agreed to the sale to PAS of CIC shares held by them directly or indirectly, conditioned on CI LLC's agreement to offer to redeem their interests."

[*12] ! the appraiser's fee would be paid 50% by CI LLC and 50% by the children accepting the offer; and

! the determination of the appraiser would be binding on CI LLC and the children accepting the offer.

The tenth term or condition included the following provision: "Your acceptance will result in the purchase of the identified membership interest[s]". The letter stated that the purchase price would be reduced by the amounts of any distributions from CIC LLC to the children after the closing of the SPA and before the child's interest was redeemed.

On January 7, 2005, PepsiCo paid $50 million to CIC to settle the lawsuit. CIC contributed the $50 million to CI LLC.

On January 8, 2005, CIC distributed its 100% membership interest in CI LLC to the various shareholders of CIC in the same proportions as their ownership interests in CIC.

Shortly before the SPA's closing date the shareholders of CIC transferred their CIC shares to CIC Holding LLC in exchange for membership interests in CIC Holding LLC. The result of this transfer was that CIC Holding LLC was the sole owner of the shares of CIC.

**[*13]** The SPA closed on January 10, 2005. Pursuant to the SPA, CIC Holding LLC sold all shares of CIC to PAS for $340 million plus a working capital adjustment. The ultimate purchase price PAS paid to CIC Holding LLC was approximately $352.4 million.

After the closing, on January 12, 2005, CIC Holding LLC was merged out of existence and into CI LLC. The parties have stipulated that this merger was part of the same transaction as the sale of the CIC shares to PAS.

The merger of CIC Holding LLC into CI LLC resulted in CI LLC's owning (1) the proceeds from the PAS sale (approximately $352.4 million after payment of final working capital adjustment); (2) the $50 million PepsiCo paid to settle the lawsuit; and (3) the assets CIC formerly owned except for its soft-drink and vending-machine assets. CI LLC was also liable for various postclosing obligations that were set forth in the SPA.[8] CI LLC was now owned by the former

---

[8]Sec. 2.4 of the SPA required CI LLC to enter into an agreement to provide transition services to PAS with an initial term ending 18 months after the closing of the SPA. CI LLC and PAS executed the transition services agreement on January 10, 2005. PAS paid CI LLC a monthly fee for its services, as required by the agreement.

Sec. 9.1 of the SPA prohibited CI LLC, Koons, and the shareholders of CI LLC from directly or indirectly engaging in the business of the bottling, distribution, and sale of soft drinks and the ownership of vending-machine operations in Ohio and Florida until January 10, 2010, except (1) as a passive owner, with no active participation in the business, of not more than 5% of the outstanding stock of a

(continued...)

[*14] shareholders of CIC in the same proportions as their respective shareholdings in CIC before the sale.

Pursuant to section 9.3 of the SPA, CI LLC was required until January 10, 2012, to (a) own directly at all times cash, cash equivalents, or marketable securities with an aggregate fair market value of at least $10 million; and (b) maintain a positive net worth at all times of at least $40 million.

On January 7, 2005, Koons borrowed $30 million from U.S. Bank National Association. The repayment date was January 21, 2005.

---

[8](...continued)
corporation or (2) as an employee providing services to PAS or CIC. Koons and four other key executives of CI LLC were required to enter into agreements with PepsiCo not to participate in or have an interest in any nonalcoholic beverage business in the United States through that date.

At the time the transaction with PAS closed, CIC was in the process of dealing with an environmental matter regarding waste water discharge at CIC's Riviera Beach, Florida, production facility. Pursuant to sec. 9.7 of the SPA, if CIC did not bring operations at the facility into compliance with the OSHA carbon dioxide standard by the date of the closing, (a) PAS would take the steps necessary to bring the facility into compliance and CI LLC would pay all costs reasonably incurred by PAS in order to do so, and (b) CI LLC would pay all penalties of noncompliance. Pursuant to sec. 3.19 of the SPA, CI LLC warranted that: (a) CIC and its subsidiaries were in compliance with (and not liable under) environmental, occupational safety, and health laws, (b) there were no pending environmental claims regarding any of CIC's facilities, (c) there were no hazardous materials present or released by CIC and its subsidiaries, and (d) there would be no reasonable basis for CIC and its subsidiaries to receive any citation related to hazardous activity or materials, or other environmental, health, or safety liabilities. Pursuant to secs. 11.1 and 11.2 of the SPA, CI LLC's liability for its warranties under sec. 3.19 expired after January 10, 2012.

[*15] Effective January 8, 2005, CI LLC's operating agreement was amended. As amended, the operating agreement provided that:

!	CI LLC was to be managed by a Board of Managers.

!	The Board of Managers was to be appointed by majority vote of the members.

!	The Board of Managers could be removed without cause by a majority vote of the members.

!	A majority vote of the members was required for amending the operating agreement and for "the LLC's consolidation, merger, sale of all or substantially all of its assets, liquidation, dissolution or winding up."

!	The Board of Managers was required to "consult[]" with a Board of Advisors that included Koons's children.

!	The Board of Managers was required under section 3.4 of the operating agreement to make distributions to the members to cover the members' federal and state income tax liabilities for their shares of CI LLC's profits.

!	The Board of Managers was permitted to make distributions to the members of "Distributable Cash" (defined as "for any fiscal year, all

[*16] revenues and other receipts less all cash expenditures, and less the reservation of funds deemed necessary or desirable by the Board of Managers") at its sole discretion.

- ! Members of CI LLC were permitted to transfer their membership interests to Koons's direct lineal descendants, including his children and grandchildren.

- ! Transfers to other persons were permitted only with a 75% vote of the members.

- ! No member could be obligated to make additional capital contributions unless unanimously approved by all the members.

On January 9, 2005, CIC completed the transfer of its non-soft-drink and non-vending-machine assets to CI LLC. Among the assets transferred to CI LLC was Queen City Racquet Club, LLC, a health fitness club in Cincinnati that had been owned by CIC since 1987.

On January 21, 2005, CI LLC made a pro rata distribution of $100 million to its members.[9] Koons received approximately $50 million from that distribution.

---

[9]From its inception through 2010, CI LLC has made the following distributions to its members:

(continued...)

[*17] The four Koons children either directly or indirectly received approximately $29.6 million. Under the terms of the letters from CI LLC offering to redeem their interests, this payment reduced the amount that CI LLC was required to pay the children upon the redemption of their interests in CI LLC.

On the same day, January 21, 2005, Koons repaid the January 7, 2005, $30 million loan from U.S. Bank National Association.

---

[9](...continued)

| | |
|---|---|
| Jan. 21, 2005 | $99,999,999.99 |
| Mar. 15, 2005 | 109,761.21 |
| Mar. 29, 2005 | 563,670.00 |
| Apr. 12, 2005 | 292,319.28 |
| Apr. 13, 2005 | 1,578,275.96 |
| May 16, 2005 | 335,586.11 |
| June 14, 2005 | 662,633.80 |
| Sept. 9, 2005 | 662,633.80 |
| Dec. 29, 2005 | 9,171,657.14 |
| Jan. 13, 2006 | 662,633.80 |
| Apr. 12, 2006 | 34,232,000.00 |
| Apr. 12, 2006 | 301,000.00 |
| June 9, 2006 | 168,000.00 |
| Sept. 7, 2006 | 12,000.00 |
| Jan. 12, 2007 | 100,700.00 |
| Apr. 13, 2007 | 57,844.50 |
| May 4, 2007 | 275,000.00 |
| June 13, 2007 | 153,884.50 |
| Sept. 12, 2007 | 13.00 |
| May 12, 2008 | 192,604.80 |

**[*18]** On the same day, January 21, 2005, Koons lent $20 million to CI LLC. The loan was due January 21, 2008. It carried an interest rate of 3.5%.

On January 24, 2005, Christina N. Koons signed the December 21, 2004 letter offering to redeem her interest in CI LLC. She was the first of the four children to accept the offer.

On January 27, 2005, James B. Koons signed the December 21, 2004 letter offering to redeem his interest in CI LLC. He was the second of the four children to accept the offer.

On February 4, 2005, Koons amended the terms of the Revocable Trust. The record establishes that (1) Koons's children were among the beneficiaries of the Revocable Trust before the amendment, (2) the amendment removed them as beneficiaries of the Revocable Trust, and (3) after the amendment the beneficiaries of the Revocable Trust were Koons's grandchildren, the lineal descendants of Koons's grandchildren, and the surviving spouses of either group. Other than this, the record reveals little about (1) the terms of the Revocable Trust before this amendment or (2) the terms of the Revocable Trust immediately after this amendment until it was next amended on February 16, 2005.

On February 10, 2005, Koons contributed his membership interest in CI LLC to the Revocable Trust.

[*19] On February 16, 2005, Koons again amended the terms of the Revocable Trust. It is unclear what terms of the Revocable Trust were changed by this amendment. This amendment did not change the beneficiaries of the Revocable Trust; thus, the beneficiaries remained Koons's grandchildren, the lineal descendants of Koons's grandchildren, and the surviving spouses of either group. The full terms of the Revocable Trust after this amendment are in the record. The duration of the Revocable Trust is perpetual. Article V of the Revocable Trust document authorized the trustees to manage the assets of the trust. It stated that the trustees "may borrow money for any purpose" that the trustees may deem advisable. Article II provided that Koons could revoke the trust and that if he did so all the assets of the trust were to revert to him.[10] The Revocable Trust provided that during Koons's lifetime the trustees were to accumulate income in the trust or pay any part of the income or principal to Koons or for Koons's benefit as directed by Koons in writing. Furthermore, Koons had the right during his lifetime to direct the trustees how to exercise the voting powers of the Revocable Trust's membership interest in CI LLC and to direct the trustees how to dispose of the Revocable Trust's membership interest in CI LLC. The Revocable Trust

---

[10]Koons's power to revoke the trust was apparently not a power that transferred to his personal representative at his death. None of the parties suggest otherwise.

[*20] document provided that after Koons's death the trustees were to pay to Koons's executor any sum requested by the executor for the payment of (1) estate taxes, (2) expenses, or (3) "bequests or other obligations of * * * [the Koons] estate (excluding non-contractual claims)." The assets remaining after these payments to the executor were to be administered by the trustees; the trustees were to accumulate income in the trust or pay any part of the income or principal to Koons's grandchildren, the lineal descendants of Koons's grandchildren, and the surviving spouses of either group. The Revocable Trust document provided that if a trustee resigned, the trustee would be replaced by a person approved by a majority of the trustees. No replacement trustee could be a descendant of Koons. The trustees of the Revocable Trust when Koons died (on March 3, 2005) were Richard Caudill, Michael Caudill, Shell, Martin, Elliott, and G. Jack Donson, Jr.

Also on February 16, 2005, Koons created a revocable trust known as the "J.F. Koons III Supplemental Revocable Trust dated 2/16/2005",[11] created a revocable trust known as the "J.F. Koons III Revocable Trust for the benefit of

---

[11]The specific terms of this trust are not in the record.

**[\*21]** Mary Jane Mitchell and John H. Mitchell dated 2/16/2005",[12] and restated the 2004 GSTT Exempt Appointment Trust.[13]

On February 18, 2005, Koons signed instructions to the trustees of the Revocable Trust, directing them to vote the trust's interest in CI LLC in favor of amending the CI LLC operating agreement, in the manner set forth in an exhibit attached to the instructions, to (i) eliminate his children as permitted transferees of membership interests; (ii) eliminate the Board of Advisors (which included his children); and (iii) for the first 15 years of CI LLC's operations, limit discretionary distributions per year to 30% of the excess of "Distributable Cash" over income tax distributions made under section 3.4.

On February 21, 2005, James B. Koons wrote a letter to his father complaining that the terms of the redemption offer "felt punitive" but thanking him for the "exit vehicle" and acknowledging that the children would "like to be gone." He made various other complaints, observations, and suggestions. He predicted that the Board of Managers of CI LLC would attempt to justify its existence by having the company buy operating businesses when, according to him, it would be

---

[12]The specific terms of this trust are not in the record.

[13]The terms of this trust are not in the record.

[*22] better for the owners of the company if the company invested in passive assets. He continued:

> This brings me to another comment from one of my lawyers. His opinion is the structure of the Operating Agreement guarantees litigation. It is not a question of "if" only "when". When the Board of Managers starts making decisions that benefit themselves over the Koons family (which they will), there will be litigation. You can count on it.

He emailed a copy of the letter to each of his siblings.

On February 22, 2005, John F. Koons IV signed the December 21, 2004 letter offering to redeem his interest in CI LLC. He was the third of the four children to accept the offer.

On February 25, 2005, Koons transferred 60% of the payments payable to him under his $20 million loan to CI LLC of January 21, 2005: Specifically, he transferred 55% of the payments to the trustee of the J.F. Koons III Supplemental Revocable Trust dated 2/16/2005 and 5% of the payments to the trustee of the J.F. Koons III Revocable Trust for the benefit of Mary Jane Mitchell and John H. Mitchell dated 2/16/2005.

On February 27, 2005, Deborah Koons Garcia signed the December 21, 2004 letter offering to redeem her interest in CI LLC. She was the last of the four children to accept the offer.

[*23] On March 1, 2005, the operating agreement for CI LLC was amended to limit, for 15 years, the annual amounts of discretionary distributions to CI LLC members to 30% of the excess of "Distributable Cash" over income tax distributions made under section 3.4.

A few days before he died (he died on March 3, 2005), Koons responded to the February 21, 2005 letter from his son, James B. Koons. Koons wrote: "I am going to study your letter of February 21st and if I wish to accept any of your suggestions I will let you know at an appropriate time."

On March 3, 2005, Koons died. As noted above, Koons had already transferred his interest in CI LLC to the Revocable Trust. At the date of Koons's death, the Revocable Trust had a 50.50% total percentage interest in CI LLC, which included a 46.94% voting interest and a 51.59% nonvoting interest. The net asset value of the assets and liabilities of CI LLC at the date of death was $317,909,786. The following is a list of assets and liabilities of CI LLC as of the date of death:

| | |
|---|---:|
| Cash | $322,117,296 |
| Accounts receivable (trade) | 61,235 |
| Accounts receivable (other) | 7,038,067 |
| Inventory | 1,890,190 |
| Prepaid expenses | 1,191,301 |
| Current assets | 332,298,089 |

| | |
|---|---:|
| **[*24]** Land | 146,962 |
| Building & improvements | 8,866,502 |
| Machinery & equipment | 3,261,195 |
| Property under capital leases | 11,172,370 |
| Accumulated depreciated | (10,744,399) |
| Total plant, property & equipment | 12,702,630 |
| | |
| Other assets | 5,949,002 |
| Total other assets | 5,949,002 |
| | |
| Total assets | 350,949,721 |
| | |
| Current portion of LTD | 2,143,793 |
| Accounts payable | 289,484 |
| Accrued income tax | 883,413 |
| Accrued taxes - other | 121,063 |
| Accrued payroll | 459,038 |
| Customer deposits | 64,038 |
| Accrued other | 8,527,343 |
| Current liabilities | 12,488,172 |
| | |
| Notes payable (to decedent) | 20,000,000 |
| Lease obligation (to related entity) | 551,762 |
| Long term liabilities | 20,551,762 |
| | |
| Paid-in capital | 74,324,982 |
| Accumulated other comp. income | 211,208 |
| Retained earnings | |
| | 243,373,596 |
| Members equity | 317,909,786 |
| | |
| Total Liabilities and Equity | 350,949,720 |
| Net Asset Value | 317,909,786 |

Set forth in a table below is a list of the owners of membership interests of CI LLC

as of the March 3, 2005 date of death.

| [25]<br>Name | Voting percentage interest | Nonvoting percentage interest | Percentage interest |
|---|---|---|---|
| J.F. Koons III, Revocable Trust | 46.94 | 51.59 | 50.50 |
| Patricia B. Koons | -0- | 1.42 | 1.09 |
| James B. Koons | 2.65 | 1.89 | 2.08 |
| Christina N. Koons | 0.83 | 0.22 | 0.36 |
| Koons Family Trust (Share JF) | 5.32 | 4.90 | 5.00 |
| Koons Family Trust (Share D) | 11.01 | 7.99 | 8.70 |
| Koons Family Trust (Share JB) | 5.61 | 5.16 | 5.27 |
| Koons Family Trust (Share C) | 6.10 | 5.61 | 5.73 |
| John F. Koons III, Trust (a.k.a. KRW Trust Share C) | 1.79 | 1.65 | 1.69 |
| John F. Koons, Sr. & Ethel Bolan Koons Trust (Trust A)[1] | 9.93 | 9.14 | 9.32 |
| Caroline M. Koons Present Interest Trust | 1.47 | 0.78 | 0.94 |
| Kathleen M. Koons Present Interest Trust | 1.47 | 0.78 | 0.94 |
| Maura L. Koons Present Interest Trust | 1.47 | 0.71 | 0.88 |
| Jeremy B. Koons Present Interest Trust | 1.47 | 0.78 | 0.94 |
| Morgan N. Koons Present Interest Trust | 1.47 | 0.78 | 0.94 |
| Nicholas Koons Baker Present Interest Trust | 1.24 | 0.58 | 0.73 |
| C.N.K.B. Present Interest Trust | 1.23 | 0.57 | 0.72 |
| J.F. Koons III, 1998 Irrevocable GST Exemption Trust | -0- | 3.60 | 2.75 |
| Patricia B. Koons, 1998 Irrevocable GST Exemption Trust | -0- | 1.85 | 1.42 |

[1]Upon his death, Koons exercised a limited power of appointment to transfer this interest to the 2004 GSTT Exempt Appointment Trust, as restated on February 16, 2005. John F. Koons, Sr., and Ethel Bolan Koons were Koons's parents.

Of the membership interests shown in the table above, the following interests were owned directly or indirectly by the Koons children:

[*26] **!** James B. Koons

**!** Christina N. Koons

**!** Koons Family Trust (Share JF)

**!** Koons Family Trust (Share D)

**!** Koons Family Trust (Share JB)

**!** Koons Family Trust (Share C)

**!** John F. Koons III Trust (a.k.a. KRW Trust Share C)

At the time of Koons's death, CI LLC had approximately 40 employees who were providing services relating to information systems, accounting, tax, and employee benefit plan administration, among other things, to PAS, for a monthly fee paid by PAS to CI LLC, as required by the transition services agreement. See supra p. 13 and note 8.

As of April 30, 2005, the redemptions of the CI LLC membership interests owned by the Koons children ultimately closed. CI LLC made initial closing payments to the children on or about June 8, 2005, and made final payments on or about July 1, 2005. The total amount CI LLC paid in redemption of its membership interests was $90,700,169, an amount that does not include the $100 million pro rata distribution made on January 21, 2005. The recipients of the redemption payments were:

[*27] ! James B. Koons

! Christina N. Koons

! Koons Family Trust (Share JF)

! Koons Family Trust (Share D)

! Koons Family Trust (Share JB)

! Koons Family Trust (Share C)

! John F. Koons III Trust (a.k.a. KRW Trust Share C)

After the redemption of the Koons children's interests on April 30, 2005, the

Revocable Trust's interest was a 70.93% total percentage interest in CI LLC (a

70.42% voting interest and a 71.07% nonvoting interest). Below is a table showing

the owners of the membership interests of CI LLC immediately after the

redemptions:

| Name | Voting percentage interest | Nonvoting percentage interest | Total percentage interest |
|---|---|---|---|
| J.F. Koons III, Revocable Trust | 70.42 | 71.07 | 70.93 |
| Patricia B. Koons | -0- | 1.96 | 1.53 |
| 2004 GSTT Exempt Appointment Trust, as restated on February 16, 2005. (This interest was formerly owned by the John F. Koons, Sr. & Ethel Bolan Koons Trust (Trust A).) | 14.89 | 12.59 | 13.09 |
| Caroline M. Koons Present Interest Trust | 2.20 | 1.08 | 1.33 |
| Kathleen M. Koons Present Interest Trust | 2.20 | 1.08 | 1.33 |

| | | | |
|---|---|---|---|
| [*28] Maura L. Koons Present Interest Trust | 2.20 | 0.97 | 1.24 |
| Jeremy B. Koons Present Interest Trust | 2.20 | 1.08 | 1.33 |
| Morgan N. Koons Present Interest Trust | 2.20 | 1.08 | 1.33 |
| Nicholas Koons Baker Present Interest Trust | 1.85 | 0.79 | 1.03 |
| C.N.K.B. Present Interest Trust | 1.84 | 0.78 | 1.02 |
| J.F. Koons III, 1998 Irrevocable GST Exemption Trust | -0- | 4.95 | 3.86 |
| Patricia B. Koons 1998 Irrevocable GST Exemption Trust | -0- | 2.56 | 1.99 |

Effective June 29, 2005, CI LLC's operating agreement was amended by amendment No. 2. The amendment barred transfers of membership interests to the Koons children.

By checks dated August 24 and September 30, 2005, CI LLC repaid in full its $20 million promissory note to Koons of January 21, 2005.

Employees of CI LLC oversaw the design and construction of capital projects to remediate elevated levels of carbon dioxide in certain areas of the production facility in Riviera Beach, Florida. Employees of CI LLC thereafter reviewed field testing with consultants to verify that the remediation completely addressed the issues. Once the corrections were complete, CI LLC entered into a release agreement with PAS on December 13, 2005, and paid PAS $35,000 to settle its obligations under the SPA pertaining to the Riviera Beach facility.

[*29] In December 2005 CI LLC acquired an operating company, T&T Pallets, Inc., for approximately $2.85 million.  The company was engaged in the wood pallet recycling business.

Effective February 27, 2006, CI LLC's operating agreement was amended by amendment No. 3.  Amendment No. 3 modified section 3.4 of the agreement, which had required CI LLC to make distributions to the members of CI LLC to cover the federal and state income taxes that members would pay on their shares of CI LLC's profits.  Amendment No. 3 provided that the members' tax liability for these purposes included local taxes, not merely federal and state taxes.

In addition to its interest in CI LLC, which was held through the Revocable Trust, the Estate's assets as of February 27, 2006, were:

**[*30]** <u>Liquid assets</u>

| | |
|---|---:|
| Estate | $547,421 |
| Revocable Trust | 14,023,731 |
| J.F. Koons III Supplemental Revocable Trust dated 2/16/2005 | 4,610,656 |
| Burger Trust | 10,983 |
| Subtotal | 19,192,791 |

<u>Illiquid assets</u>

| | |
|---|---:|
| Estate (Ibis Country Club membership interest and 50% interest in Koons & Poisson Building Partnership) | [1]1,058,635 |
| Revocable Trust (residences in Indian Hill, Ohio; Ryland Heights, Kentucky; and Jupiter, Florida) | 6,400,000 |
| Subtotal | 7,458,635 |
| Total | 26,651,426 |

[1]This is the value as reported by the Estate on the estate tax return. The value comprised $26,026 for the Ibis Country Club membership interest and $1,032,609 for the 50% interest in the Koons & Poisson Building Partnership. However, the parties have agreed that the value of the Estate's interest in the Koons & Poisson Building Partnership as of the date of Koons's death was $1,131,360 rather than $1,032,609.

On February 27, 2006, CI LLC's Board of Managers executed a consent resolving that "it is in the best interests of the Company to loan the * * * [Revocable Trust] the principal amount of $10,750,000."

On February 28, 2006, CI LLC lent the Revocable Trust $10,750,000 in exchange for a term promissory note in the principal amount of $10,750,000 at 9.5% per year interest with principal and interest due in 14 equal installments of

[*31] approximately $5.9 million each between August 31, 2024, and February 28, 2031. The terms of the loan prohibited prepayment. The total interest component of the 14 installments is $71,419,497. The proceeds of the loan would be used to make a payment toward the estate and gift tax liabilities.

The Revocable Trust's primary asset was its interest in CI LLC. The Revocable Trust's anticipated source of funds for payment of the principal of $10,750,000 and interest of $71,419,497 was distributions from CI LLC. At the time of the loan, CI LLC had over $200 million in highly liquid assets. It owned only two operating companies: Queen City Racquet Club LLC and T&T Pallets, Inc. The assets of the two companies constituted a small fraction--4%--of CI LLC's assets.

The table below shows the owners of CI LLC when the loan was entered into (February 28, 2006).

| Name | Total ownership interest[1] | Trustees (if owner is a trust) | Beneficiaries (if owner is a trust) |
|---|---|---|---|
| J.F. Koons III, Revocable Trust | As reflected in the previous table, approximately 70.93% | Richard Caudill, Michael Caudill, Shell, Martin, Elliott, and Donson | Koons's grandchildren, the lineal descendants of Koons's grandchildren, and the surviving spouses of either group |
| Patricia B. Koons (Koons's first former wife) | As reflected in the previous table, 1.53% | N/A | N/A |

| [*32] 2004 GSTT Exempt Appointment Trust, as restated on February 16, 2005 | As reflected in the previous table, 13.09% | Richard Caudill, Michael Caudill, Shell, Martin, Donson, and Elliott. | Koons's grandchildren and their lineal descendants |
|---|---|---|---|
| Seven present interest trusts: Caroline M. Koons Present Interest Trust, Kathleen M. Koons, Present Interest Trust, Maura L. Koons Present Interest Trust, Jeremy B. Koons Present Interest Trust, Morgan N. Koons Present Interest Trust, Nicholas Koons Baker Present Interest Trust, and C.N.K.B. Present Interest Trust | As reflected in the previous table, 8.61% | Shell and Michael Caudill | Each of Koons's grandchildren. Each of the present interest trusts terminates when the beneficiary turns forty-five |
| Patricia B. Koons 1998 Irrevocable GST Exemption Trust | As reflected in the previous table, 1.99% | Donson and Elliott. | Patricia B. Koons's lineal descendants and their surviving spouses |
| J. F. Koons III, 1998 Irrevocable GST Exemption Trust | As reflected in the previous table, 3.86% | Donson and Elliott | Koons's lineal descendants and their surviving spouses |

[1]The voting percentage interests, nonvoting percentage interests, and total percentage interests on February 28, 2006, are the same as those reflected in the prior table showing the voting percentage interests, nonvoting percentage interests, and total percentage interests immediately after the April 30, 2005 redemptions. There are two reasons we conclude that the voting percentage interests, nonvoting percentage interests, and total percentage interests on February 28, 2006, are the same as those immediately after the April 30, 2005 redemptions. First, the respondent contends that the percentage interests were the same on February 28, 2006, as immediately after the April 30, 2005 redemptions, and the petitioners do not contend otherwise. Second, Exhibit 24-J contains a list of percentage interests on February 27, 2006, the day before the loan, that is the same as the percentage interests immediately after the April 30, 2005 redemptions.

On March 3, 2006, Michael Cundall, the son of Koons's sister, Betty Lou Cundall, filed suit against all owners of CI LLC membership interests. He alleged that in 1984 Koons had breached his fiduciary duties as the trustee of Michael Cundall's immediate family's trust and as president of CIC when CIC had redeemed the trust's interests in CIC in 1984. On June 4, 2009, the Ohio Supreme Court held that the suit was barred by the statute of limitations.

[*33] On April 12, 2006, the Revocable Trust received a distribution from CI LLC of approximately $22.73 million. It used the distribution to pay Koons's income tax liability for 2005.

On or about June 5, 2006, the Estate timely filed a Form 706 (hereinafter the "Estate Tax Return"). The Estate had received a three-month extension of time to file because of Hurricane Wilma in addition to an automatic filing extension of six months. The Estate reported on the Estate Tax Return that the fair market value of the Revocable Trust's interest in CI LLC as of the date of death was $117,197,442.72. This reported value is based on a report prepared by Mukesh Bajaj dated May 31, 2006. On Schedule J of the Estate Tax Return, the Estate claimed a deduction of $71,419,497 for the interest on the loan from CI LLC to the Revocable Trust.

In August 2006 CI LLC acquired an operating company, CK Products LLC, for approximately $7.3 million. This company and T&T Pallets, Inc., were the only two operating companies CI LLC acquired, although it has conducted investigations of numerous other acquisition opportunities.

On February 22, 2007, the beneficiaries of the present interest trusts (i.e., Koons's grandchildren) requested that the present interest trusts' interests in CI LLC be redeemed at book value.

**[\*34]** On April 26, 2007, CI LLC decided not to redeem the interests of the Koons grandchildren held by the present interest trusts.

Annually since 2006 CI LLC has accrued interest income associated with the loan to the Revocable Trust on its books and recognized and reported the income for tax purposes.

T&T Pallets, Inc.'s business was adversely affected by the recession, and ultimately the decision was made to wind down the business. In September 2008, CI LLC sold most of T&T Pallets, Inc.'s assets.

In 2009, CI LLC's subsidiaries (Queen City Racquet Club LLC, T&T Pallets, Inc., and CK Products LLC) generated positive operating cashflow of $1,553,157 and distributed approximately $1.3 million to CI LLC.

OPINION

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner are incorrect. Tax Ct. R. Pract. & Proc. 142(a)(1); Bronstein v. Commissioner, 138 T.C. 382, 384 (2012). This rule has exceptions. The Commissioner has the burden of proof with respect to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer", Tax Ct. R. Pract. & Proc. 142(a)(1), and with respect to any factual issue for which the taxpayer has introduced credible evidence and met other

[*35] requirements, sec. 7491(a)(1) and (2). Our conclusions are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

1.    The Estate cannot deduct $71,419,497 of projected interest expense on the $10,750,000 loan from CI LLC to the Revocable Trust.

The liquid assets held by the Estate (not including its interest in CI LLC, held through the Revocable Trust) were about $19 million on February 27, 2006. The Estate faced an estate-tax liability of approximately $21 million and the Revocable Trust faced a generation skipping transfer tax liability of approximately $5 million, as these liabilities were reported on the petitioners' tax returns, and $64 million and $20 million, respectively, as subsequently determined in the 2009 notices of deficiency. To raise the money to pay the liabilities, the Revocable Trust borrowed $10.75 million from CI LLC in 2006. Under the terms of this $10.75 million loan, the interest and principal payments were to be made by the Revocable Trust in installments from the year 2024 through 2031. Because the installments were deferred for over 18 years, the interest component of the installments was high; it totaled $71,419,497.

**[\*36]** Section 2053(a) provides that for the purposes of the estate tax, the taxable estate is determined by deducting from the value of the gross estate various amounts, including administration expenses, as are allowable by the laws of the jurisdiction under which the estate is being administered. Administration expense deductions against the gross estate are limited by regulation to "such expenses as are actually and necessarily incurred in the administration of the decedent's estate; that is, in the collection of assets, payment of debts, and distribution of property to the persons entitled to it." 26 C.F.R. sec. 20.2053-3(a) (2009). The regulation further provides: "Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions." Id. Interest payments on loans can be deducted if the loan is necessary to raise money to pay the estate tax without liquidating the assets of the estate at forced-sale prices. See Estate of Huntington v. Commissioner, 36 B.T.A. 698, 726 (1937); Estate of Gilman v. Commissioner, T.C. Memo. 2004-286 (collecting cases).

It was not necessary for the Revocable Trust to borrow the $10.75 million from CI LLC in order to pay the two federal tax liabilities. When it borrowed the money on February 28, 2006, the Revocable Trust had 70.42% voting control over CI LLC. CI LLC had over $200 million in highly liquid assets. The Revocable

[*37] Trust had the power to force CI LLC and its Board of Managers to make a pro rata distribution to its members, including the Revocable Trust itself.[14] The Revocable Trust's ability to force CI LLC to distribute its assets made it unnecessary for the Revocable Trust to borrow from CI LLC. See Estate of Black v. Commissioner, 133 T.C. 340, 384 (2009); Estate of Stick v. Commissioner, T.C. Memo. 2010-192.

The petitioners argue that the loan was preferable to a distribution of cash from CI LLC to the Revocable Trust because a cash distribution would leave CI LLC with less cash to buy businesses. But the loan also depleted CI LLC of cash. CI LLC transferred the principal amount of the loan--$10.75 million--to the Revocable Trust on or about February 28, 2006. And lending money to the Revocable Trust did not avoid the necessity of making distributions altogether; it merely postponed the necessity. To repay the loan, the Revocable Trust will have to rely on future distributions from CI LLC. Thus, CI LLC will eventually need to make distributions to the Revocable Trust.

---

[14]The Revocable Trust's 70.42% voting interest was sufficient to allow it to amend the operating agreement to remove the 30% limit on discretionary distributions that had been added to the operating agreement on March 1, 2005. A majority vote was required to amend the operating agreement.

**[\*38]** Furthermore, the Estate must remain active long enough for the loan to be repaid. The loan repayments are due 18 to 25 years after the death of Koons. Keeping the Estate open that long hinders the "proper settlement" of the Estate. See 26 C.F.R. sec. 20.2053-3(a) (2009).

The loan was not necessary to the administration of the Estate. Therefore, the projected interest to be paid under the loan is not a deductible administration expense of the Estate.[15]

2.  The fair market value of the Revocable Trust's interest in CI LLC as of March 3, 2005, Koons's date of death, is $148,503,609.

The next issue is the fair market value of the Revocable Trust's interest in CI LLC when Koons died on March 3, 2005. On that day, the net asset value of CI LLC's assets was $317,909,786. The Revocable Trust owned a 50.50% total interest in CI LLC, which was a 46.94% voting interest and a 51.59% nonvoting interest. The pro rata asset value of the Revocable Trust's interest is 50.50% multiplied by $317,909,786, or $160,544,442. The parties agree that the value of the Revocable Trust's interest in CI LLC is less than the pro rata asset value. The parties agree that the difference is due to the lack of marketability of the interest in

---

[15]The respondent also contends that the loan was not bona fide. We need not reach this issue.

**[*39]** CI LLC as compared to the marketability of CI LLC's underlying assets.[16] However, the parties disagree on the magnitude of the marketability discount. The petitioners contend that the marketability discount is 31.7%, which would cause the value of the Revocable Trust's 50.50% interest to be $109,651,854. The respondent contends that the marketability discount is 7.5%, which would cause the value of the Revocable Trust's 50.50% interest to be $148,503,609. The parties rely on expert testimony to establish the appropriate discount to be applied.

a. The petitioners' expert: Bajaj

The petitioners called Mukesh Bajaj as an expert witness. Bajaj holds a Ph.D. in finance from the University of California at Berkeley. He served as an assistant professor of finance and business economics at the University of Southern California until 1995. Bajaj's expert report, which, along with his expert rebuttal report, was admitted as testimony, is different from the report he prepared that was attached to the Estate Tax Return.

Bajaj's expert report first considered whether there should be a "potential adjustment for the Subject CI LLC Interest's premium (or discount) associated with the control (or lack thereof) of the operating decisions of the LLC." Bajaj

---

[16]As explained below, neither party agreed that the value should be adjusted for control or lack thereof.

[*40] concluded that no premium should be applied because the holder of the Revocable Trust's interest in CI LLC would have had only 46.94% voting power and would not have had sufficient control to enable the holder of that interest to derive what Bajaj called "private benefits." He opined that even a holder of a 70.42% voting interest in CI LLC (which was the fractional interest held by the Revocable Trust after CI LLC redeemed the children's interests on April 30, 2006) could not have accrued private benefits, reasoning that: (1) the operating agreement limited the discretionary distributions of assets by the Board of Managers,[17] (2) the SPA prevented CI LLC from dissolving and distributing all its assets until after January 10, 2012,[18] and (3) a supermajority vote of the members was required for some actions.[19] Bajaj did not apply a discount for lack of control.

Bajaj then determined the discount for lack of marketability. As an initial step, he used the following equation to explain the difference between (1) the price of the publicly-traded stock of a company, and (2) the price of the same type of

---

[17]Bajaj referred to the 30% limitation imposed by the amendment of March 1, 2005.

[18]Bajaj was referring to sec. 9.3 of the SPA.

[19]Under the operating agreement, no member could be obligated to make additional capital contributions without unanimous approval of all the members. Furthermore, transfers of interests to persons not direct descendants of Koons required a 75% vote of the members.

**[\*41]** stock of the same company sold privately under the regulatory restriction that the buyer must wait before reselling the shares:

$$\text{Discount} = 4.9 \\ + (0.4)*(\underline{\text{Fraction of shares issued}}) \\ - (0.1)*(\underline{\text{Financial distress}}) \\ - (7.2)*(\underline{\text{Registration indicator}}) \\ + (3.1)*(\underline{\text{Business risk}})$$

The equation was taken from his 2001 regression study of 88 companies. See Mukesh Bajaj, David J. Denis, Stephen P. Ferris & Atulya Sarin, "Firm Value and Marketability Discounts", 27 J. Corp. L. 89 (2001). To apply the equation to the Revocable Trust's 50.50% interest in CI LLC, Bajaj assigned the following values to the equation's independent variables: 50.5 to Fraction of Shares Issued, 6.4 to Financial Distress, 0 to Registration Indicator, and 0.6 for Business Risk.[20] The assignment of these values resulted in a discount of 26.6%, which Bajaj determined was an "initial marketability discount" for the Revocable Trust's interest in CI LLC. Bajaj believed that the Revocable Trust's interest in CI LLC was different in some ways from the shares in the 88 companies that were used to derive this equation. To adjust for these differences, he determined that the net asset value of CI LLC should be reduced by an additional marketability discount

---

[20] Pages 20-21 of Bajaj's report explained the independent variables, and page 22 explained the values he assigned to the independent variables.

**[\*42]** of 4%. The 4% discount was specifically intended to account for the effect of the following differences between CI LLC and the 88 companies involved in the study: (1) CI LLC could not be dissolved until January 10, 2012,[21] (2) PAS had the right under the transition services agreement to purchase services from CI LLC, (3) CI LLC and its employees were bound by noncompetition agreements, (4) CI LLC was liable to pay the costs of carbon-dioxide compliance at the Riviera Beach facility under the SPA, (5) CI LLC was liable for environmental representations and warranties made under the SPA, (6) CI LLC was liable for insurance claims. Then Bajaj imposed an additional 3% discount because (1) CI LLC was a closely-held, small, unknown limited liability company, and (2) an interest in CI LLC could not be sold to persons not direct descendants without a 75% vote of the members.

As a result of the 26.6%, 4%, and 3% discounts, the total discount arrived at by Bajaj was 31.7%.[22] Bajaj therefore opined that the value of the Revocable

---

[21]Bajaj was referring to sec. 9.3 of the SPA.

[22]According to our calculation, this percentage should be equal to

$$1 - (1-.266)(1-.04)(1-.03)$$

We calculate this to be 31.64992%, which rounds to 31.6%. The difference between our calculation (31.6%) and Bajaj's calculation (31.7%) seems to be

(continued...)

[*43] Trust's interest was equal to the pro rata net asset value of CI LLC's assets minus 31.7%.

b.      The respondent's expert:  Burns

The respondent called Francis X. Burns as an expert witness.  Burns is an experienced appraiser who is accredited by the American Society of Appraisers and the Institute of Business Appraisers.  His expert report and expert rebuttal report were admitted into evidence as testimony.

Burns first considered whether the degree of control over CI LLC that would be exercisable by the owner of the Revocable Trust's interest should have an effect on the value of the interest compared to the pro rata share of the value of the company's assets.  In determining the nature of the control rights residing in the Revocable Trust's 50.50% interest, Burns considered the interest to be a majority interest in CI LLC.  Even though the interest was only a 46.94% voting interest on the date of Koons's death, Burns believed it was reasonably foreseeable

---

[22](...continued)
caused by a rounding error Bajaj made in one of his intermediate calculations.  The intermediate calculation, which appears in para. 60 of his report, is:

$$29.6\% \ [=1-(1-26.6\%)*(1-4\%)]$$

The correct intermediate calculation, 29.536%, when rounded to the nearest tenth of a percentage, is 29.5%, not 29.6%.

[*44] that the redemptions of the interests of the four children would occur. Such redemptions would increase the voting power of the Revocable Trust's interest to 70.42%. Even this degree of control did not justify a control premium, according to Burns. Burns observed that CI LLC's major assets were cash rather than operating assets. Burns stated: "It was unlikely that a controlling member in CI LLC could extract value above its pro-rata claim on company assets." Conversely, Burns found no justification for discounting the value of CI LLC's assets for the lack of control. Burns reasoned that the voting power of the interest in question--70.42%--allowed the owner to control the Board of Managers. Burns concluded that neither a premium nor a discount should be made on account of control.

The next step in Burns's analysis was to determine a discount for lack of marketability. Burns took into account Bajaj's 2001 study of restricted stock (among other studies). Unlike Bajaj, however, Burns did not use this study to perform a regression analysis to predict the marketability discount for the ownership interest in CI LLC. Burns opined that a 5-10% marketability discount was warranted. In reaching this conclusion, Burns considered the following characteristics of the Revocable Trust's 50.50% interest in CI LLC: (1) there was only a small risk that the redemptions would not be completed, (2) there were

[*45] obligations imposed on CI LLC by the stock-purchase agreement, including those related to potential environmental, health, and safety liabilities, (3) it was reasonable to expect that CI LLC would make cash distributions, (4) there were transferability restrictions in the operating agreement, (5) the owner of the Revocable Trust's interest would have had the ability to force CI LLC to distribute most of its assets once the redemptions closed, (6) most of CI LLC's assets were liquid. Within the 5-10% range, Burns thought that 7.5% would reflect a reasonable compromise between a seller and a buyer. He therefore opined that the value of the Revocable Trust's interest was equal to the pro rata net asset value of CI LLC's assets minus 7.5%.

      c.     Analysis of the two approaches

One difference between Bajaj's approach and Burns's approach is that Burns assumed that the redemptions would occur. Before Koons's death, his children had accepted CI LLC's offer to redeem their interests. Once these redemptions closed, the proportion of votes held by someone owning the Revocable Trust's interest would increase from 46.94% to 70.42%.[23] Bajaj

---

[23]The redemptions of the children's interests did not change the Revocable Trust's pro rata share of CI LLC's assets. Although the fractional ownership interest held by the Revocable Trust in CI LLC rose, the value of the assets owned

(continued...)

[*46] disagreed with Burns's assumption that the redemptions would occur. He opined that a "substantial risk existed that the redemptions might not be consummated." His valuation method assumed that the redemptions would not occur. To the variable Fraction of Shares Issued he assigned the value 50.50%: This was the ownership share of the Revocable Trust without the redemptions. The petitioners recognize that "[p]erhaps the biggest difference in Dr. Bajaj's and Mr. Burns's analysis is the percentage ownership attributed to the Subject Interest."

We agree with Burns's assumption. The redemption offers were binding contracts by the time Koons died on March 3, 2005. CI LLC had made written offers to each of the children to redeem their interests in CI LLC on December 21, 2004. Each of the four children had signed an offer letter by February 27, 2005. Once signed, the offer letters required the children to sell their interests in CI LLC to CI LLC.

The petitioners argue that the signed offer letters were unenforceable under Ohio law because they lacked important terms, such as the price at which CI LLC would redeem the interests. We disagree. The offer letters stated that the price at

---

[23](...continued)
by CI LLC fell (because its assets were used to pay the children for the redemptions).

**[\*47]** which the interests in CI LLC would be redeemed was equal to each owner's proportionate share of the value of CI LLC's assets (minus its liabilities). Most of the assets were cash and could be easily valued. Thus, the redemption price of the interests could be easily ascertained. Under these circumstances, a state court would have enforced the signed offer letters. See Preston v. First Bank of Marietta, 473 N.E.2d 1210, 1214 (Ohio Ct. App. 1983) (contracts will be enforced where "the agreed price, though not specifically stated, is easily ascertainable by reference to some extrinsic standard"). Had the children reneged, CI LLC could have successfully sued them for breach of contract. Furthermore, although under Ohio law specific performance is available only where there is no adequate remedy at law, Gleason v. Gleason, 582 N.E.2d 657, 661 (Ohio Ct. App. 1991), a court would have ordered specific performance instead of monetary damages because monetary damages would be insufficient to compensate CI LLC for breach of the signed redemption offers. An essential element of the redemption offers was to remove the Koons children from the ownership structure of CI LLC. Therefore, the court would have ordered that the children's interests in CI LLC be transferred to CI LLC.[24]

---

[24]Specific performance of a contract is required by courts where monetary

(continued...)

**[\*48]**  The petitioners also argue that the children did not intend to sell their interests in CI LLC after signing the offer letters.  As support, the petitioners refer to a February 21, 2005 letter by James B. Koons in which he complained to his father (Koons) that the "terms of the [redemption] offer felt punitive".  But the same letter stated:  "I do want to express my gratitude for the exit vehicle."[25]  It also acknowledged the children "would like to be gone."  The testimony at trial likewise suggests that the children did not want an ownership stake in the company; they wanted cash.  It is apparent that the managers of CI LLC also wanted the children removed as owners.  In short, both sides had an incentive to fulfill the terms of the redemption offers after acceptance.  The children wanted to

---

[24](...continued)
damages is an inadequate remedy.  See 25 Samuel Williston, A Treatise on the Law of Contracts, sec. 67:1, at 184 (4th ed. 2002) ("Assuming, then, that a valid contract exists and has been broken, the general rule defining the instances where specific performance will be granted may be stated as follows: where damages are an inadequate remedy and the nature of the contract is such that specific enforcement of it will not be impossible or involve too great practical difficulties, such as long, drawn out and extensive supervision, equity will grant a decree of specific performance.").

[25]The petitioners also point to a statement in the letter that "When the Board of Managers starts making decisions that benefit themselves over the Koons family (which they will), there will be litigation.  You can count on it."  The statement refers to litigation over the managerial decisions that would be made in the future by CI LLC's Board of Managers, after the redemptions, when CI LLC would be owned by Koons's grandchildren.  It does not indicate James B. Koons's intention to use litigation to get out of his acceptance of the offer letter.

[*49] sell their interests; CI LLC wanted to buy them. The petitioners' suggestions otherwise are aptly characterized by the respondent as attempts "to create a smokescreen of uncertainty around the redemptions which did not in fact exist as of the valuation date."

We agree with other assumptions made by Burns. Burns concluded that a discount for lack of control was not warranted. We agree. The interest to be valued should be considered a majority interest. There should be no discount for lack of control.

Burns also assumed that a member of CI LLC with a 70.42% voting interest could order CI LLC to distribute most of its assets. Although the operating agreement limited discretionary distributions to 30% of the difference between distributable cash and income tax distributions, this provision could be eliminated by a majority vote of the members. See supra p. 39 and note 17. Such a vote could be cast by a 70.42% voting interest member acting alone. Bajaj opined that it would be illegal for the Board of Managers to distribute most of the assets of CI LLC. We disagree. Bajaj's conclusion rests in part on a January 5, 2006 legal memo opining that CI LLC was barred from "dissolving and distributing all assets to its Members until January 10, 2012." But a distribution of most of the assets is different from a distribution of all of the assets. In fact, section 9.3 of the SPA

[*50] only required CI LLC to own liquid assets with an aggregate fair market value of at least $10 million, and maintain a positive net worth of at least $40 million, until January 10, 2012. Bajaj also did not believe that CI LLC's Board of Managers would distribute most of CI LLC's assets because, Bajaj noted, Koons had expressed the desire that after his death CI LLC should invest its assets in operating businesses. Koons's desire may have influenced CI LLC's Board of Managers and the trustees of the Revocable Trust after his death. CI LLC's Board of Managers had the authority to manage CI LLC's assets. The Revocable Trust held a 46.94% voting interest in CI LLC immediately after his death, an interest that increased to 70.42% after CI LLC redeemed the interests of Koons's children, thereby giving the Revocable Trust the power to replace, and therefore control, the Board of Managers of CI LLC. However, the Revocable Trust's voting interest in CI LLC must be valued not as if it were owned by the Revocable Trust, but at the price that would be agreed on by a hypothetical buyer and seller. 26 C.F.R. sec. 20.2031-1(b) (2012).[26] Hypothetical buyers and sellers of the Revocable Trust's

---

[26]As we said in Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998) (citations omitted):

The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the

(continued...)

[*51] interest in CI LLC would consider the possibility that CI LLC could be forced to distribute most of its assets.  They would not be wedded to the idea that CI LLC should necessarily operate businesses.

That CI LLC could be forced by its majority member to distribute most of its assets suggests a way of establishing the minimum value of the majority interest.  A majority member who could force CI LLC to distribute most of its assets would not sell its membership interest for less than the member's share of such a distribution.  See Estate of Jones v. Commissioner, 116 T.C. 121, 135 (2001) (a controlling partner who could compel the partnership to sell its assets and distribute the proceeds would not sell the partnership interest for less than a proportionate share of the value of assets).  The holder of the 50.50% interest in CI LLC, whose voting power would increase from 46.94 to 70.42% after the redemptions, could receive about $140 million in a distribution.[27]  Thus, $140

---

[26](...continued)
same as the individual characteristics of the actual seller or the actual buyer. The hypothetical willing buyer and the hypothetical willing seller are presumed to be dedicated to achieving the maximum economic advantage.

[27]CI LLC's total assets were worth almost $318 million and it was required to retain $40 million of these assets.  Thus, CI LLC could distribute approximately $278 million ($318 million - $40 million) to its members.  Multiplying $278 million by 50.50% results in a potential distribution of $140 million to the holder of the

(continued...)

[*52] million is the minimum sale price of the 50.50% interest. Bajaj's view--that the value of the interest was approximately $110 million--must therefore be rejected. Burns's valuation of approximately $149 million is above the minimum $140 million value.

According to Bajaj, Burns underestimated the effect of the various obligations imposed on CI LLC by the SPA in arriving at the value of an interest in CI LLC. Bajaj also thought that Burns failed to consider that the value of an interest in CI LLC would be diminished by the possibility of the Cundall lawsuit. However, we believe Burns appropriately took into account the liabilities imposed on CI LLC by the SPA and the possibility of the Cundall lawsuit. The SPA required CI LLC to be liable to PAS for various environmental, health, and safety liabilities. As Burns reasoned, the SPA was designed by PAS (and by the other parties) to require CI LLC to have enough assets to pay these liabilities. CI LLC had to maintain $40 million in assets. This was 12.6% of the value of its assets at the time Koons died. We believe that the $40 million holding requirement was based on PAS's implicit prediction that the liabilities imposed on CI LLC by the SPA would be far less than $40 million. As for the Cundall lawsuit, that suit

[27](...continued)
50.50% interest.

[*53] related to conduct by Koons dating back to 1984. The lawsuit was dismissed as time barred. Furthermore, the suit was not brought until almost a full year after Koons's death. Under these circumstances, the possibility as of the date of death of the future Cundall lawsuit does not convince us that Burns overvalued the Revocable Trust's interest in CI LLC. Even Bajaj applied a discount of only 4% to account for, among other things, the liabilities that might be faced by members of CI LLC (such as the possibility of a lawsuit by Cundall) and the liabilities imposed on CI LLC by the SPA. We do not believe that Burns underestimated the effect of these liabilities on the value of the 50.50% interest.

Bajaj also contends that Burns ignored the provision in the CI LLC operating agreement that requires a 75% vote to transfer an interest of CI LLC to persons not direct descendants of Koons. Bajaj's contention is belied by a review of Burns's expert report, which states:

> There are a number of factors that may influence the size of discounts for lack of marketability. For the Subject Interest, there are several elements to considered.
>
>   \*     \*     \*     \*     \*     \*     \*
>
> Transferability of Member Interests
> Article V of the Operating Agreement allows for the transfer of a member's interest with the prior written consent by 75% of the voting members.

[*54] Thus, Burns did consider the transferability restriction in arriving at the marketability discount. Burns did not consider the transferability restriction to be as significant as did Bajaj. But this is because Burns believed--correctly--that a holder of the Revocable Trust's interest in CI LLC could eventually force CI LLC to distribute most of its assets to its members or control its investment decisions.

Burns also assumed that most of the assets of CI LLC would remain liquid. This was a reasonable assumption for a cash-rich company controlled by a 70.42% majority voting member. The majority member could order the company to distribute most of its assets. The member would therefore require the company to keep most of its assets in liquid form so that they might be distributed, or, if the member instead permitted the company to invest its assets in operating businesses, it would do so only if it expected that these ventures would increase the value of the company beyond the value of a distribution of most of its assets.

Burns did not use a regression equation to determine the marketability discount. We do not view this as a fatal defect in Burns's analysis. Burns's opinion was based on experience and common sense. He convincingly explained why Bajaj's use of the regression equation to predict a marketability discount of

[*55] the Revocable Trust's interest was flawed.[28] First, Bajaj's regression

equation was derived from a data set of 88 companies that earned their profits

mainly from active business operations. But CI LLC had only two small operating

businesses. Second, the regression equation explained only one-third of the

variation in the valuation discounts in the ownership interests in the 88 companies

from which the equation was derived. Bajaj, supra at 113. Third, Burns rightly

questioned the applicability of the regression equation to CI LLC given that all 88

of the transactions involved ownership interests of less than 50.50%. Fourth,

Burns convincingly explained that the regression equation used by Bajaj

systematically overestimated the relationship between block size and the valuation

discount. The regulatory restrictions on privately-sold stocks impeded the sale of

large blocks more than the sale of small blocks. Therefore, the equation Bajaj used

erroneously attributed valuation discounts to the size of the block rather than

to the regulatory restrictions. This error caused Bajaj to overestimate the

marketability discount applicable to the Revocable Trust's interest in CI LLC,

which was a relatively large block.

---

[28]Bajaj used a regression equation to arrive at the 26.6% discount, which was the largest of the three discounts he applied.

**[\*56]**  After hearing the testimony of both experts, we decline to rely on Bajaj's regression equation to determine the value of the Revocable Trust's interest in CI LLC on the date of Koons's death.  We agree with Burns that the value of the Revocable Trust's 50.50% interest in CI LLC as of the date of death was:

$148,503,609 = (50.5%)($317,909,786)(1-7.5%).

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.