[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10646
_____

Agency Docket No. 19772-09

ESTATE OF JOHN F. KOONS, III,
Deceased,
A. MANUEL ZAPATA,
Personal Representative,
JOHN F. KOONS III, REVOCABLE TRUST,
WILLIAM P. MARTIN, II,
A. MANUEL ZAPATA,
ROBERT W. MAXWELL, II,
KEVEN E. SHELL,
MICHAEL S. CAUDILL,
Trustee,
D. SCOTT ELLIOTT,
Trustee,

Petitioners-Appellants,

versus

COMMISSIONER OF IRS,

Respondent-Appellee.

_____

No. 16-10648
_____

Agency Docket No. 19771-09

ESTATE OF JOHN F. KOONS, III,
Deceased,
A. MANUEL ZAPATA,
Personal Representative,

                                                    Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

                                                    Respondent-Appellee.

_____

Petitions for Review of a Decision
of the United States Tax Court
_____

(April 27, 2017)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and REEVES,[*] District Judge.

REEVES, District Judge:

_____

[*] Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

The Internal Revenue Service (IRS) issued a notice of deficiency to the Estate of John F. Koons, III after determining a $42,771,586.75 deficiency in estate tax.  It also issued a notice of deficiency to the John F. Koons, III Revocable Trust after determining a deficiency in generation-skipping transfer tax of $15,899,453.13.  The Appellants filed notices challenging the deficiencies and the Tax Court consolidated the two cases.  The Appellants now appeal the Tax Court's ruling, which concluded that the Commissioner had determined both deficiencies correctly.   We affirm the Tax Court's decision for the reasons that follow.

## I.

John F. Koons, III died on March 3, 2005, survived by two ex-wives, four children and seven grandchildren.  Koons had operated Central Investment Corp. (CIC), which primarily bottled and distributed Pepsi products and also sold vending machine items.  Koons owned 46.9% of the company's voting stock and 51.5% of its nonvoting stock in 2004.  His children owned most of the remaining stock, either directly or through trusts, while other family members and trusts held the remaining shares.

CIC and PepsiCo, Inc. (PepsiCo), became involved in a dispute over exclusivity rights that led to litigation in 1997.  The parties later resolved the dispute.   CIC sold its soft-drink and vending-machine businesses to PepsiAmericas, Inc. (PAS), an affiliate of PepsiCo, under the terms of the

settlement.  PAS ultimately paid $352,400,000 for CIC's stock and PepsiCo paid an additional $50,000,000 as part of the settlement.

The Koons children were displeased with Koons's plan to place the PAS sale proceeds in CI LLC, where they would be invested in new businesses run by professional advisers.  As a result, they conditioned the sale of their CIC shares to PAS on receiving an offer from CI LLC to redeem their interests in CI LLC after the PAS closing.  CI LLC offered to redeem each child's interests by letter dated December 21, 2004.  The offer included several "terms and conditions," including the method of computing the redemption price.  The Koons children consented to the PAS transaction and each accepted the redemption offers before Koons's death.  The redemption offers closed on April 30, 2005 (after Koons's death), and final redemption payments were made by July 2005.

The terms of PAS's acquisition of CIC's soft-drink and vending-machine business were outlined in a stock purchase agreement (SPA) executed on December 15, 2004.  The SPA provided that PAS would purchase all CIC shares and acquire all of its operations, except for certain assets that were not involved in CIC's soft drink or vending machine businesses.  CIC transferred to CI LLC those assets that PAS did not acquire before the PAS sale closed.

CIC distributed its 100% membership interest in CI LLC to CIC's shareholders in proportion to their interests in CIC on January 8, 2005.  On January

4

10, 2005, the SPA closed and PAS purchased CIC's shares for $352,400,000. As a result of the sale,[1] CI LLC obtained: (1) $352,400,000 in proceeds from the PAS sale; (2) $50,000,000 that PepsiCo paid in the settlement; and (3) the CIC assets that were unrelated to its soda and vending machine businesses and that PAS did not acquire. The unrelated assets that CI LLC retained included four businesses, three of which CI LLC sold shortly after the sale closed. The only remaining operating business was Queen City Racquet Club, valued at $3,815,045.

CI LLC also retained certain obligations following the sale. CI LLC agreed to provide 18 months of transition services in exchange for a monthly fee. It also retained pension plan obligations and was responsible through 2012 for certain warranties relating to environmental, health, and safety liabilities. The SPA also required that CI LLC hold at least $10,000,000 in liquid assets and maintain a positive net worth of at least $40,000,000 at all times.

CI LLC's operating agreement was amended around the time of the sale. The operating agreement provided, among other things, that the LLC would be managed by a Board of Managers, and that the Board of Managers could be removed without cause by a majority vote of the members. Likewise, a majority

---

[1] Another entity, CIC Holdings LLC, was created to facilitate the PAS sale and was merged into CI LLC after the sale was completed. PAS paid the purchase price to CIC Holding and, after the sale, CIC Holding was merged out of existence and into CI LLC. CI LLC then acquired the proceeds of the sale.

vote of the members was needed to take significant actions such as a merger, liquidation, or dissolution. The Board of Managers also was permitted to make distributions at its sole discretion. Further, it was required to consult with a Board of Advisors composed, in part, of Koons's children. Transfers were limited, but members were permitted to transfer membership interests to Koons's lineal descendants such as his children and grandchildren.

CI LLC made a pro rata distribution of $100,000,000 to its members on January 21, 2005. The Koons children received approximately $29,600,000 of this distribution. The amount of each redemption payment was to be reduced in proportion to the amount of the distribution, pursuant to the terms of the redemption offer.

Koons amended the terms of the Revocable Trust on February 4, 2005, to remove his children as beneficiaries and replace them with his grandchildren. Koons contributed his 50.5% interest in CI LLC to the Revocable Trust later that same month. This structure subjected the transfer to a generation-skipping transfer tax.

Koons amended CI LLC's operation agreement to restrict his children's control of the LLC by eliminating the Board of Advisors, of which they were a part. He also removed the children from the list of permitted transferees of membership interests. Next, he directed the trustees to amend CI LLC's operating

agreement to include a limit on discretionary distributions.  On February 21, 2005, James B. Koons wrote to his father, complaining that the redemption offer "felt punitive."  The letter also raised various complaints and made suggestions regarding the operation of the business.  The younger Koons indicated that he expected that the Board of Managers would direct the company to buy operating businesses rather than invest in passive assets.  The letter outlined that, if the Board of Managers made decisions that were detrimental to the Koons family, "there w[ould] be litigation."  However, he thanked his father for the "exit vehicle" and stated that the Koons children would "like to be gone."

Koons died on March 3, 2005, against this backdrop.  The Revocable Trust held a 50.50% interest in CI LLC on the date of his death, which included a 46.94% voting interest and a 51.59% nonvoting interest.  CI LLC had net assets totaling $317,909,786 on the date of Koons's death.

The redemption offers the children had signed prior to Koons's death closed on April 30, 2005.  Once they closed, the Revocable Trust held a 70.93% interest in CI LLC, which included a 70.42% voting interest and a 71.07% nonvoting interest.

The Revocable Trust comprised the majority of the Estate's assets with the Trust's interest in CI LLC being its primary asset.  The Estate's remaining liquid assets, however, were insufficient to pay its tax liability.  The trustees of the Estate

declined to direct a distribution of the Revocable Trust's interest in CI LLC to pay the tax liability, believing that immediate payment would hinder CI LLC's plan to invest in operating businesses. As a result, the trustees obtained a loan from CI LLC for $10,750,000 in exchange for a promissory note bearing an annual interest rate of 9.5%. No payment was due for 18 years and principal and interest were scheduled to be repaid in 14 installments between August 2024 and February 2031. Prepayments were not permitted and the projected interest payments would total $71,419,497. Because the Revocable Trust's primary asset was its interest in CI LLC, it anticipated that the loan would be repaid with distributions from CI LLC.

CI LLC had over $200,000,000 in liquid assets at the time of the loan. Additionally, it owned two operating companies: Queen City Racquet Club, LLC, and a company CI LLC had acquired in 2005, T & T Pallets, Inc. These companies, however, accounted for only 4% of CI LLC's assets. During the time leading up to the litigation before the Tax Court, CI LLC had acquired only one other company, CK Products LLC, for approximately $7,300,000. Thus, CI LLC continued to be comprised largely of liquid assets.

The Estate filed its tax return in June 2006, claiming a $71,419,497 deduction for interest on the loan as an administrative expense. It also reported the market value of the Revocable Trust's interest in CI LLC to have been

8

$117,197,442.72 as of the date of Koons's death. This amount was based on a valuation report prepared by Dr. Mukesh Bajaj on May 31, 2006.

The Commissioner determined a $42,771,586.75 estate tax deficiency and a $15,899,463 generation-skipping transfer tax deficiency due to her determination that the interest payment was not entitled to a deduction and that the return understated the value of the Trust's interest in CI LLC. The Commissioner originally concluded that the value of the Trust's interest was $136,462,776, rather than $117,197,442.72, as reported. However, she later amended her answer to assert an increased deficiency after concluding that the value of the CI LLC interest at the date of Koons's death was actually $148,503,609.

The Tax Court consolidated the two cases for trial after the Estate of John F. Koons, III and the John F. Koons, III Revocable Trust filed petitions challenging the IRS's notices of deficiency. *Koons v. Comm'r*, 105 T.C.M. (CCH) 1567 (2013). During trial, it considered the opinions of the Appellants' expert, Mukesh Bajaj, and Francis X. Burns, the Commissioner's expert. The court concluded that both experts appropriately declined to apply a discount for lack of control, and that the difference between their opinions was their competing conclusions regarding the lack of marketability discount.

The Tax Court first noted that Dr. Bajaj's opinion differed from the report he had previously prepared for the Estate Tax Return. Dr. Bajaj determined the

9

applicable discount for lack of marketability based on an equation used to quantify the difference between the price of the publicly-traded stock of a company and the price of the same type of stock of the same company sold under regulatory restrictions requiring that the buyer wait before reselling shares. This equation was based on a regression analysis of 88 companies, and resulted in a discount of 26.6%. However, Dr. Bajaj recognized several differences between CI LLC and the 88 companies on which his equation was based—the CI LLC could not be dissolved until 2012, it had obligations under the transition services agreement, there were noncompete agreements binding the LLC and its employees, and it had various obligations under the SPA.

Dr. Bajaj also observed that CI LLC was a small, closely held limited liability company in which an interest could not be sold to persons other than Koons's lineal descendants without a supermajority vote. He further found a significant risk that the redemption offers would not close but that, even if they did close, a majority interest holder would not be able to order a distribution of most of the LLC's assets. Dr. Bajaj applied a total lack of marketability discount of 31.7% and assigned a value of the Trust's interest as its pro rata entitlement to CI LLC's assets, less 31.7%.

The Tax Court acknowledged that Burns did not use a regression analysis to determine a lack of marketability discount. Instead, Burns considered: the

characteristics of CI LLC, including a small risk that the redemptions would not be completed; the obligations imposed on the LLC by the SPA; the likelihood that the LLC would make cash distributions; the transferability restrictions in the operating agreement; the Revocable Trust's ability to force a distribution of most of the LLC's assets once it held a majority interest after redemptions closed; and the fact that the majority of the LLC's assets were liquid. Based on these characteristics, Burns concluded that a 7.5% lack of marketability discount was appropriate and determined the interest's value to be the pro rata net value of the LLC's assets, less 7.5%.

The Tax Court issued a decision following trial in which it first observed that the burden of proof varied for certain issues; however, allocation of the burden of proof was immaterial because its decision would be made based on the preponderance of the evidence. *Koons v. Comm'r*, 105 T.C.M. (CCH) 1567 (2013). It then held that the Estate was not permitted to deduct the projected interest expense on the loan from CI LLC to the Revocable Trust. In reaching this holding, the Tax Court concluded that the loan was not necessary to the administration of the estate because, at the time the loan was made, CI LLC had over $200,000,000 in liquid assets and the Revocable Trust had a sufficient voting interest to force a pro rata distribution in the amount of the debt. The court also rejected the Estate's argument that the loan was preferable because a distribution

11

would have depleted the LLC of cash that could have been used to purchase additional businesses. As it noted, the loan also depleted the LLC of cash. Additionally, the Tax Court observed that the loan would ultimately be repaid using the Revocable Trust's distributions from CI LLC, such that it merely delayed the use of distributions to pay the Estate's tax liability. Further, the loan repayments were due 25 years after Koons's death, which hindered the proper settlement of the Estate.

The Tax Court adopted Burns's opinion regarding the fair market value of the Revocable Trust's interest in CI LLC as of the date of Koons's death and it agreed with Burns regarding the likelihood that the redemptions would occur. While Dr. Bajaj concluded that there was a substantial risk that the redemptions would not be consummated, the Tax Court pointed out that each of the four children had signed the redemption offer by the time of Koons's death. It further concluded that the offers were sufficiently detailed to be enforceable, and that a court likely would have required specific performance in the event of breach. The Tax Court found, as a factual matter, that the redemptions were almost certain to occur. Based on the evidence presented at trial, it determined that "[t]he children wanted to sell their interests; CI LLC wanted to buy them."

The Tax Court further reasoned that the Revocable Trust could order a distribution of most of the LLC's assets as the majority interest holder. Although

12

the operating agreement limited cash distributions, the trust could use its 70.42% voting trust to amend the agreement and eliminate this requirement. Additionally, the interest holder could use his or her majority interest to remove the Board of Managers, should the Board attempt to prevent a distribution.

The Tax Court found that the interest could not be valued at less than the amount that the interest holder could receive in the distribution (i.e., a hypothetical seller would not sell its interest for less than the amount that it could receive in a distribution) based on its determination that the interest holder could force a distribution of most of the LLC's assets. It then concluded that an interest holder would receive approximately $140,000,000 in a distribution, and that the interest could not appropriately be valued for less than this amount. The Tax Court rejected Dr. Bajaj's $110,000,000 valuation of the interest because it was significantly lower than this amount. Likewise, the court concluded that Burns's valuation was more appropriate because Burns's valuation was slightly above the minimum $140,000,000.

Burns underestimated the effect of the various obligations facing the LLC at the time of valuation according to Dr. Bajaj. Notwithstanding this testimony, the Tax Court concluded that Burns appropriately considered these liabilities. It found that the SPA's requirement that the LLC retain $40,000,000 in assets "was based on PAS's implicit prediction that the liabilities imposed on CI LLC by the SPA

13

would be far less than [$40,000,000]." It further noted that Dr. Bajaj only applied a 4% discount, indicating that even Dr. Bajaj believed that the SPA liabilities would not be that significant. Burns also considered the transfer restrictions but did not find them as significant as Dr. Bajaj believed them to be because the majority interest holder could direct a distribution and would not then need to sell the interest. Similarly, Burns assumed that most of the LLC's assets would remain liquid because the company was "cash-rich" and the purchaser of a majority interest could keep the assets liquid so as to facilitate a distribution.

The Tax Court concluded that Burns's decision to not use a regression analysis such as that used by Dr. Bajaj was not a "fatal defect," particularly since Burns "convincingly explained" that Dr. Bajaj's use of that tool was flawed. As Burns pointed out, most of the subject companies earned profits from active operating businesses while CI LLC had only two small active companies. Moreover, there were variations in the valuation discount of the ownership interests of the companies, and the regression equation only explained a third of the variation. Further, all 88 of those transactions involved ownership interests of less than 50.50%. Finally, Burns explained that the Dr. Bajaj equation overestimated the relationship between block size and the valuation discount because the equation erroneously attributed valuation discounts to the size of the blocks of privately-sold stock. In fact, it was not the size of privately-sold blocks

14

that impeded their sale but the existence of regulatory restrictions.  According to

Burns, these errors caused Dr. Bajaj to overestimate the value of the marketability

discount.

## II.

The Tax Court's rulings on the interpretation and application of law are

reviewed *de novo*.  *Roberts v. Comm'r*, 329 F.3d 1224, 1227 (11th Cir. 2003) (per

curiam).  Conversely, its factual findings are reviewed for clear error.  *Davenport*

*Recycling Assocs. v. Comm'r*, 220 F.3d 1255, 1258 (11th Cir. 2000).  "[W]hether

the Tax Court used the correct legal standard to determine fair market value is a

legal issue . . . .  A determination of fair market value is a mixed question of fact

and law: the factual premises are subject to a clearly erroneous standard while the

legal conclusions are subject to *de novo* review."  *Palmer Ranch Holdings Ltd. v.*

*Comm'r*, 812 F.3d 982, 993 (11th Cir. 2016) (citation omitted).

## III.

### A.    Burden of Proof

The Appellants argue that the Tax Court erred in declining to shift the

burden of proof to the Commissioner because his determination of the interest's

fair market value was arbitrary and erroneous.  The Tax Court determined that

allocating the burden of proof was unnecessary because its decision was based on a

preponderance of all the evidence presented.  *Koons v. Comm'r*, T.C. Memo 2013-

94 (2013).    As the Fifth Circuit has stated, "where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, [courts] may decide on the weight of the evidence and not on an allocation of the burden of proof." *Whitehouse Hotel Ltd. Partnership v. Comm'r*, 615 F.3d 321, 332 (5th Cir. 2010) (internal quotation marks and citation omitted).

The Tax Court was correct in its statement that it was not required to allocate the burden of proof to decide this case.    However, even if the Commissioner did err in failing to allocate the burden of proof, any such error was harmless because a preponderance of the evidence supports the Commissioner's decision. *See Blodgett v. Comm'r*, 394 F.3d 1030 (8th Cir. 2005).

## B.    Administration Expenses Under Section 2053(a)(2)

An estate is permitted to deduct expenses that are "actually and necessarily [] incurred in administration of the decedent's estate."  Treas. Reg. § 20.2053-3(a). This regulation clarifies that "[e]xpenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions." *Id*.  "Expenses incurred to prevent financial loss to an estate resulting from forced sales of its assets [] to pay estate taxes are deductible administration expenses." *Estate of Graegin v. Comm'r*, 56 T.C.M. (CCH) 387 (1988).  Conversely, interest payments are not a deductible expense if the estate would have been able to pay the debt using the liquid assets of

16

one of its entities, but instead elected to obtain a loan that will eventually be repaid using those same liquid assets.

The Tax Court has held that interest payments on a loan are a necessary expense where the estate would have otherwise been forced to sell its assets at a loss to pay the estate's debts. In *Estate of Graegin v. Comm'r*, 56 T.C.M. (CCH) 387 (1988) [2], the estate held a substantial number of shares of voting stock of a closely held corporation. However, it lacked sufficient liquidity to pay its tax liability and, as a result, obtained a loan from a third party rather than selling its voting stock. The court concluded that the interest payment was necessarily incurred and properly deducted as an administrative expense. In reaching this conclusion, the court recognized that the loan was necessary to avoid a forced sale of the stock, and that the interest payment was thus necessarily incurred. *See also Estate of Todd v. Comm'r*, 57 T.C. 288 (1971) (concluding that interest on a loan was a necessary expense because the estate consisted of largely illiquid assets, and had it not obtained the loan, it would have been forced to sell its assets on unfavorable terms to pay the taxes); *Estate of Huntington v. Comm'r*, 36 B.T.A. 698 (1937) (allowing an interest deduction because the expense "avoided the necessity of sacrificing the assets of the estate by immediate or forced sale.")

---

[2]    This case does not have page numbers.

The Tax Court has also permitted an interest deduction where an estate obtained a loan and later used redeemed stock to repay that loan. In *McKee v. Comm'r*, 72 T.C.M. (CCH) 324 (1996), the decedent acquired a closely held corporation, and held stock in that corporation that was subject to restrictions (such as limiting the transfer of stock to certain transferees). The corporation's available cash and loan resources were strained at the time of the decedent's death. Therefore, the executors obtained a loan from a private source that was secured by the decedent's stock. In approving the deduction for interest payments on the loan, the court concluded that the corporation "was neither able nor required to redeem enough of these shares to provide funds to pay" the estate's liability when it was due. *Id*. at 12. It also acknowledged that the executors anticipated that the stock's value would increase, making it easier to repay the loan at a later date. *Id*.

An interest deduction, however, is properly denied if the estate can pay its tax liability using the liquid assets of an entity, but elects instead to obtain a loan from the entity and then repay the loan using those same liquid assets. In *Estate of Black v. Comm'r*, 133 T.C. 340 (2009), the decedent held personal stock shares, which were by far his most significant asset and accounted for substantially all of the estate's remaining value. Black founded a family limited partnership and transferred the stock shares to the limited partnership in exchange for a proportionate interest in the entity. *Id*. at 348. After Black's passing, his estate

18

borrowed $71,000,000 from the family limited partnership and claimed a deduction for the interest paid on the loan. *Id*. at 383.

The petitioner argued that the interest was a necessary expense because the loan was necessary to solve the estate's "liquidity dilemma" and because the estate's executor "exercised reasonable business judgment when he borrowed the necessary funds rather than cause [the limited partnership] either to distribute those funds to the estate or to redeem a portion of the estate's interest" in the limited partnership. *Id*. at 381. The Commissioner responded that the loan was unnecessary because the petitioner had authority to distribute the stock the limited partnership held through a distribution or a partial redemption of the limited partnership interest. *Id*. at 382.

The Tax Court held that the interest was not a necessary administrative expense. In reaching this conclusion, it determined that the regular partnership distributions would not be sufficient to repay the loan, and that the borrowers were thus aware that they would eventually have to sell the stock to repay it. *Id*. at 383. The court then noted that the petitioner had the ability to modify the partnership agreement to allow an ordered pro rata distribution, and that such a distribution would not have violated the petitioner's fiduciary duties. *Id*. at 384. Thus, regardless of whether the estate obtained a loan and repaid it or immediately ordered a distribution (or partially redeemed the partnership interest), the estate

19

would have to sell the stock. *Id*. The only difference between the two approaches was that the former resulted in a tax deduction. *Id*.

The court then determined that the "loan structure, in effect, constituted an indirect use of [the decedent's] stock to pay the debts . . . and accomplished nothing more than a direct use of that stock for the same purpose would have accomplished, except for the substantial estate tax savings." *Id*. at 385. It also observed that *Todd*, *Graegin*, and *McKee* involved loans that were necessary to avoid the sale of illiquid assets, and that these cases did not involve the sale of the lender's stock or assets to pay the borrower. *Id*. Finally, because the petitioner was a majority partner in the limited partnership, "he was on the both sides of the transaction, in effect paying interest to himself," resulting in the payments having no effect on his net worth aside from the tax savings. *Id*.

*Keller v. United States*, 697 F.3d 238 (5th Cir. 2012), is also instructive. There, the deceased created a family limited partnership and transferred community partnership bonds to that partnership shortly before her death, resulting in the estate lacking sufficient liquidity to pay its debts. The Fifth Circuit discussed the distinction between necessary and unnecessary loans drawn in Tax Court cases. It observed that the distinction between *Black* and *Todd*, *Graegin*, and *McKee* is that in *Black*, the estate would inevitably have to sell the stock to pay the loan because it lacked any other assets. *Id*. at 247. As a result, the loan

20

amounted to an "indirect use" of stock, and the estate "characterized the transfer as a 'loan' to obtain favorable tax treatment." *Id*. The Fifth Circuit then concluded that this distinction did not apply in the case before it because the limited partnership held a significant amount of illiquid assets that it could eventually use to repay the loan. *Id*. Because "[t]he Estate's repayment of the loan [was] not predicated on the inevitable redemption of the [limited partnership] interests or its assets," the transaction did not "constitute a forbidden 'indirect use' in the meaning of *Black*." *Id*. at 248.

Two conclusions may be reached based on these holdings. Interest payments are not necessary expenses where: (1) the entity from which the estate obtained the loan has sufficient liquid assets that the estate can use to pay the tax liability in the first instance; and (2) the estate lacked other assets such that it would be required to eventually resort to those liquid assets to repay the loan.

### 1. The Estate had sufficient assets to pay the tax liability.

If the Estate had been forced to sell its interest in CI LLC, it would have been required to do so at a loss. Tax Court decisions are clear that interest payments on loans constitute a necessary expense if the estate's only other option is a forced sale of assets at a loss. Therefore, if the Estate's *only* option in this case had been to redeem the Revocable Trust's interest in the LLC, then the loan would have been necessary and the interest payments on that loan would be a necessary

expense.  However, because the Revocable Trust had 70.42% voting control over CI LLC, and because CI LLC had over $200,000,000 in liquid assets, the Revocable Trust could have ordered a pro rata distribution to obtain these funds and pay its tax liability.  *Koons v. Comm'r*, T.C. Memo. 2013-94 (2013).

The Appellants argue that the CI LLC funds were not available because the Revocable Trust did not have the legal authority to order a pro rata distribution under Ohio law.  Specifically, they cite *United States v. Byrum*, 408 U.S. 125, 137-38 n. 11 (1972), in which the Supreme Court concluded that, under Ohio law, a "majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests."  The Court further concluded that a majority shareholder's fiduciary duty prohibited him from "abusing his position as majority shareholder for personal or family advantage to the detriment of the corporation or other shareholders."  *Id*. at 142-43.  The Appellants assert that, due to its fiduciary duty imposed by Ohio law, the Revocable Trust would not have been permitted to order a distribution.  Mr. Koons had a long-term investment philosophy to which CI LLC's members and Board of Managers adhered and the philosophy required that the LLC retain liquid assets for investment purposes.  It would have breached its fiduciary duty by ordering distributions to the detriment of this business model, according to the Appellants.

22

Whether the Estate had funds available to it depends on whether the Revocable Trust was legally able to order a distribution under Ohio law.

Majority interest holders owe fiduciary duties to those holding a minority interest under Ohio law. *Crosby v. Beam*, 548 N.E.2d 217, 220 (Ohio 1989). This duty is heightened in a closely held entity, and it is breached when majority interest holders utilize their control "to their own advantage, without providing minority shareholders with an equal opportunity to benefit . . . ." *Id.* at 220-21. While majority interest holders owe minority interest holders fiduciary duties, this "*do[es] not mean* that minority shareholders can frustrate the will of the majority simply by disagreeing over the course of corporate action." *Koos v. Cent. Ohio Cellular, Inc.*, 641 N.E.2d 265, 271 (Ohio Ct. App. 1994) (citations omitted) (emphasis in original). "When a person acquires shares in a corporation, he comes in to be ruled by the majority in interest, and as long as such majority acts within the scope of the powers conferred upon the corporation, the voice of the majority is the voice of the corporation and of all the shareholders." *Id.* at 271-72 (citations omitted). As a result, Ohio courts recognize "the rights of the majority to exercise control over the corporate affairs to which ownership of their shares entitled them." *Armstrong v. Marathon Oil Co.*, 513 N.E.2d 776, 782 (Ohio 1987).

In *Koos*, the minority shareholders argued that those holding a majority of shares breached their fiduciary duties by making the distribution of most of the

23

proceeds from a sale to satisfy their personal needs. *Id*. at 273. The court concluded, however, that the distribution was not a breach of fiduciary duty because the shareholders had made the distribution pro rata. *Id*. at 274. The court did not find it problematic that the distribution was for the majority shareholders' personal benefit, stating that "[a]ll corporate distributions to shareholders are made to satisfy the 'personal needs' of shareholders—that is why they are shareholders—to benefit personally from the financial success of the corporation." *Id*. It reasoned that there is no breach of fiduciary duty as "long as the shareholders share in proportion to their holdings . . . ." *Id*.

These cases severely undermine the Appellants' assertion that a distribution would have violated the Revocable Trust's fiduciary duty. Their holdings emphasize that a majority interest holder has rights associated with his interest, and these rights entitle the holder to take action beneficial to him. As long as the minority interest holder benefits equally, individuals holding the majority interest do not breach their fiduciary duties. The minority interest holders would have received an equal benefit with a pro rata distribution, and Ohio case law is clear that a majority interest holder's action is valid as long as the minority interest holder benefits equally. As in *Koos*, it would not have violated the Revocable Trust's fiduciary duties to order a pro rata distribution to enable it to pay its tax

24

liability.   Thus, the Estate had access to sufficient funds to pay its tax liability, satisfying this part of the holding in *Estate of Black*.[3]

### 2. The loan was an "indirect use" of CI LLC distributions.

Under *Estate of Black*, a loan is not unnecessary merely because the estate had access to a related entity's liquid assets and could have used those assets to pay its tax liability.  Instead, as the Fifth Circuit explained in *Keller*, a loan is unnecessary if the estate lacks any other assets with which to repay the loan, and inevitably will be required to use those same assets to repay it.  *Keller*, 697 F.3d at 247.  Stated differently, where the estate merely delays using the assets to repay the loan rather than immediately using the assets to pay the tax liability, the loan is an "indirect use" of the assets and is not necessary.  *Id*.

The loan in the present case was an "indirect use" of funds and was not necessary under the above authorities.  Aside from the Revocable Trust and the Trust's interest in CI LLC, the Estate lacked sufficient funds to repay the loan.  The Estate's Loan repayment schedule was designed to enable the Trust to repay the loan out of its distributions from CI LLC, as the Appellants acknowledge.  Accordingly, the Revocable Trust's distributions from CI LLC would be used to

---

[3]    *McKee* also suggests that a loan may be necessary where using the liquid funds available from the entity would damage it.  *McKee*, 72 T.C.M. at 12.  However, because the Tax Court stated that CI LLC had over $200,000,000 in "highly liquid" assets and the estate tax liability required a payment of under $11,000,000, it does not appear that the disbursement would have harmed the entity in this case.  The Appellants have not demonstrated otherwise.

satisfy the Estate's tax obligations regardless of whether the Estate paid its tax liability immediately or obtained a loan and then repaid the tax liability gradually.

Further, CI LLC would be paying disbursements to the Revocable Trust only to have those payments returned in the form of principal and interest payments on the loan. As in *Estate of Black*, the same entity is on both sides of the transaction, resulting in CI LLC "in effect paying interest to" itself. *Estate of Black*, 133 T.C. at 385. Similar to the loan in that case, the loan here had no net economic benefit aside from the tax deduction. This further demonstrates that the loan was not necessary within the meaning of the tax regulations.

The Appellants attempt to distinguish *Estate of Black* on the ground that the loan would have been repaid using regular disbursements rather than an immediate "extraordinary" disbursement. While they acknowledge that the loan and an immediate payment would have been paid from the same source (i.e., disbursements from CI LLC), the Appellants argue that the loan was different because an immediate disbursement would have permanently depleted the CI LLC while the loan only temporarily depleted it until a later date when it would be repaid using regular disbursements to the Revocable Trust. The Appellants have failed to demonstrate that this is a distinction with a difference under the holding of *Estate of Black*.

26

The court in *Estate of Black* spoke only in terms of the source of the funds. It gave no indication that paying a loan out of the same pool of liquid assets would be any less of an indirect use of those funds were the payments to be regular disbursements rather than an immediate (albeit significantly larger) disbursement. In either case, the same funds would be used to pay the estate's tax liability. This is precisely the "indirect use" of funds that renders a loan unnecessary. Accordingly, the holding in *Estate of Black* does not indicate that a regular disbursement from liquid assets should be treated any differently than an immediate disbursement from the same source of funds. The Appellants' attempt to distinguish this case from *Estate of Black* fails.

### 3. Courts are not required to defer to the executors' business judgment in all instances.

The Appellants also argue that courts are required to defer to the business judgment of the executors of the estate. Therefore, when the executor determines that a loan is in the best interests of the estate, the courts should permit a deduction for the interest on that loan. They rely primarily on *Estate of Murphy v. United States*, No. 97-CV-1013, 2009 WL 3366099 (W.D. Ark. Oct. 2, 2009), for this proposition. In *Estate of Murphy*, the Commissioner argued that interest expense on a loan was not necessary because the estate could have obtained sufficient funds by selling stock and distributing the proceeds to the estate to pay the taxes. *Id.* at *24. The court stated that "the executor of the estate is not required to set aside

27

good business judgment when administering an estate. If the executor acted in the best interest of the estate, the courts will not second guess the executor's business judgment." *Id.* at *24. The court concluded that the executors had acted in the estate's best interest, holding that the interest payment was a necessary expense.

The Appellant also cites two cases from the Tax Court, arguing that these decisions require deference to the business judgment of the executors of the estate. In *Estate of Sturgis v. Comm'r*, 54 T.C.M. (CCH) 221 (1987), the estate obtained a loan to pay its tax liability rather than selling an illiquid asset (timber) to meet this obligation. The court rejected the Commissioner's argument that the interest payment was not necessary because the estate could have sold the timber stating, "we are not prepared to second guess the judgments of a fiduciary not shown to have acted other than in the best interests of the estate." *Id.* Likewise, in *Estate of Thompson v. Comm'r*, 76 T.C.M. (CCH) 426 (1998), the Commissioner suggested that interest expense was unnecessary because the estate could have cut and sold timber to pay its tax liability. The court again rejected this argument, quoting *Sturgis*.[4] *Id.*

---

[4]    While the Appellants cite *McKee* as support, the Tax Court merely noted that the executors projected that the stock being used to repay the loan was expected to increase in value. As a result, it was appropriate to delay payment until that time when selling the stock would be less damaging to the entity. *McKee*, 72 T.C.M. (CCH) at 331. It did not go so far as establishing a rule that courts are required to defer to an executor's judgment in determining whether an interest payment was a necessary expense.

These cases support the Appellants' position.  However, *Murphy* is an unreported district court decision and is not binding on this Court.  And it is not clear that the Tax Court cases establish a rule generally applicable here.  *Sturgis* and *Thompson* dealt with very specific factual circumstances: the estate's choices were obtaining a loan to pay tax liability or cutting and selling timber, an illiquid asset.  The Tax Court has established that the estate may obtain the loan rather than sell the illiquid asset, and the interest payment on that loan will be considered a necessary expense.  *See Estate of Graegin v. Comm'r*, 56 T.C.M. (CCH) 387 (1988).  *Sturgis* and *Thompson* stand for the proposition that, in cases involving the forced sale of illiquid assets, courts are to defer to the executor's decision to obtain a loan to pay tax liabilities.

The Tax Court's reasoning in *Estate of Black* indicates that courts are not required to defer to the executor's business judgment in evaluating the necessity of a loan.  There, the petitioner argued that the executor had "exercised reasonable business judgment" in obtaining a loan rather than disbursing funds or redeeming the partnership business interest, and that the loan therefore should be deemed necessary.  *Estate of Black*, 133 T.C. at 381.  The fact that the Tax Court did not consider this argument is telling.  If the court were required to defer to the executor's business judgment as a general rule, it would not have questioned

29

whether the estate legitimately required the loan and would have merely deferred to the executor's decision.[5]

As a matter of policy, it is unlikely that a loan is necessary whenever the executor acted in the best interests of the estate. Courts evaluating administrative deductions are not examining the quality of the executor's decision-making. They are instead determining whether the decision to obtain a loan should result in a deduction. Moreover, if the soundness of the business judgment were the appropriate inquiry, it would be rare for a loan to be considered unnecessary. As long as the executor properly determined that a loan was appropriate, courts would be required to defer to this judgment and permit the deduction. Indeed, this leads to circular reasoning—there could be cases in which the executor determined, in a valid exercise of business judgment, that a loan rather than a disbursement was in the estate's best interest primarily because the loan would lead to a tax benefit. And if courts were required to defer to the executor's business judgment, executors would have blanket authority to establish that a deduction was proper without judicial oversight.

---

[5]    Likewise, it is instructive in the previously-discussed Tax Court cases that the court did not mention a rule requiring deferral to the executor's business judgment. Indeed, the court rarely, if ever, discussed the executor's reasons for obtaining a loan. In short, an executor's conclusion that a loan is in the estate's best interest does not compel a ruling that the loan is necessary.

In summary, while the statements in *Sturgis* and *Thompson* may be viewed as a general rule that a loan that is in the best interest of the estate is a necessary loan, such a conclusion does not comport with the regulation or the Tax Court's approach in applying it.

## C.     Fair Market Value of the Trust's Interest in CI LLC

The value of the Revocable Trust's interest in CI LLC—which is included in the Estate—is the fair market value of the interest at the time of Koons's death. Treas. Reg. § 20.2031-1(b).  "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  *Estate of Jelke v. Comm'r*, 507 F.3d 1317, 1321 (11th Cir. 2007).  The buyer and seller are hypothetical persons, each seeking to maximize economic advantage at the time of the valuation date.  *Id*. at 1321, n. 11.  All facts and elements of value relevant at the time of the applicable valuation date are to be considered.  Treas. Reg. § 20.2031-1(b).  The determination of an asset's fair market value is a mixed question of fact and law.  *Jelke*, 507 F.3d at 1321.  Factual premises are reviewed for clear error while legal conclusions are reviewed *de novo*. *Id*.

> *1. The Tax Court properly concluded that the redemptions would occur.*

31

The Appellants argue that the Tax Court improperly determined that the Koons children would redeem their CI LLC interests. The Revocable Trust's interest in the LLC was not a controlling interest at the time of Koons's death. However, each of the children had signed an offer to redeem his or her interest; once the children redeemed their interests, the Revocable Trust's voting interest in the LLC would be 70.42%. The Tax Court agreed with the Commissioner's expert who assumed that the redemptions would ultimately occur. The Tax Court made legal and factual determinations in reaching this conclusion.

The Tax Court factually determined that the children would follow through with their redemption offers. Specifically, the testimony at trial suggested that the children were not interested in an ownership stake in the LLC, but instead wanted cash. *Koons v. Comm'r*, T.C. Memo. 2013-94 (2013). Further, the testimony demonstrated that the managers of the CI LLC did not want the children to remain owners. *Id.* The court cited a letter from one of the children in supporting its conclusion on this issue, thanking Koons for the "exit vehicle." *Id.* And it found that "both sides had an incentive to fulfill the terms of the redemption offers after acceptance." *Id.* The court determined that there was not any uncertainty regarding whether the children would redeem their interests based on this evidence. *Id.*

32

The Appellants argue that this finding was clear error. They contend that there was "substantial uncertainty" regarding whether the children would proceed with the redemptions because they raised concerns regarding the offer letters' terms. Additionally, one of the children expressed numerous concerns regarding CI LLC's governance structure and the trust interests.

The Tax Court did not clearly err in assuming that the children would redeem their interests, pursuant to the agreement that each signed. The Appellants' argument that it was uncertain whether the children would follow through with the redemptions because they had raised concerns with the offers' terms is unavailing. The children nonetheless signed the agreements after raising these concerns. It is unlikely that they would have signed the agreements if these issues were so problematic as to discourage the children from redeeming their respective interests. And it is unlikely that they would have reneged on the offers based on concerns of which they were aware before signing.

The Tax Court also determined that the letter from Koons's son regarding the management of the Koons family business did not support a conclusion that there was uncertainty regarding whether the children would redeem their interests. Instead, it specifically quoted the provision expressing gratitude for providing an "exit vehicle." The testimony presented at trial further confirmed that the children

33

wanted to redeem their interests.  The Appellants have not raised sufficient concerns to justify setting aside this finding as being clearly erroneous.[6]

### 2. *The Tax Court Properly Evaluated the Fiduciary Obligations under Ohio Law.*

The Appellants also argue that the Tax Court erred in concluding that a hypothetical buyer of the Revocable Trust's interest in CI LLC would be permitted to force a distribution of most of the LLC's assets.  After evaluating all the evidence submitted, the court determined that the buyer of the Revocable Trust's interest would have a majority interest in CI LLC, and that the buyer would be able to use this interest to vote to distribute the majority of the LLC's assets, less the amount that the LLC was contractually obligated to retain.  *Koons v. Comm'r*, T.C. Memo 2013-94 (2013).  It then concluded that the fair market value of the interest would have to account for the assumption that the buyer would be able to force a distribution.

The Appellants argue that the Tax Court misinterpreted Ohio law regarding a majority interest holder's fiduciary obligations.  They contend that majority interest holders owe those holding a minority interest a heightened fiduciary duty under Ohio law.  This heightened duty prevents the majority from frustrating the

---

[6]    Because the Tax Court's factual conclusion that the redemption offers would occur will be upheld, this Court need not determine whether it correctly evaluated Ohio law in reasoning that the offers were enforceable and that a court would order specific performance in the event of breach.

purpose for which the LLC was created.  Appellants rely on *United States v. Byrum*, 408 U.S. 125, 137 (1972), for the proposition that, under Ohio law, majority shareholders have "a fiduciary duty to promote the interests of the corporation."  They also cite several other cases in which Ohio courts discuss whether a majority shareholder had a "legitimate business purpose" for a particular action.  *Kademian v. Marger*, 20 N.E.3d 1176 (Ohio Ct. App. 2014); *Hickerson v. Hickerson*, No. 5-10-08, 2010 WL 3385792 (Ohio Ct. App. Aug. 30, 2010); *Tablack v. Wellman*, No. 04-MA-218, 2006 WL 2590599 (Ohio Ct. App. Sept. 8, 2006); *Koos v. Cent. Ohio Cellular, Inc.*, 641 N.E.2d 265 (1994).  From these cases, the Appellants contend that majority shareholders have a fiduciary duty under Ohio law to have a legitimate business purpose for their actions.  As a result, where a shareholder cannot demonstrate a legitimate business purpose for an action, the action is a breach of fiduciary duty.

The Appellants claim that Koons had a business philosophy of using CI LLC's funds to invest in operating businesses, and that minority shareholders had a legitimate expectation that the LLC would adhere to that philosophy.  The Appellants thus argue that actions frustrating this goal would violate the majority shareholder's fiduciary duties under Ohio law.  Accordingly, they assert that a majority interest holder would not have been legally permitted to order a

distribution of most of CI LLC's assets.  This argument misconstrues relevant caselaw.

Ohio does impose a heightened fiduciary duty on majority shareholders, but it is focused on preventing shareholders from abusing their power at the expense of minority shareholders.  *See Edelman v. JELBS*, 57 N.E.3d 246, 255 (Ohio Ct. App. 2015).  Specifically, "a majority shareholder breaches a fiduciary duty when that shareholder manipulates his or her control over the close corporation in order to unfairly acquire personal benefits owing to or not otherwise available to minority shareholders of the close corporation."  *Yackel v. Kay*, 642 N.E.2d 1107, 1111 (Ohio Ct. App. 1994); *see also McLaughlin v. Beeghly*, 617 N.E.2d 703, 705 (Ohio Ct. App. 1992) ("When a controlling shareholder exercised that control to derive a personal benefit not available to those shareholders out of power, the controlling shareholder has breached his heightened fiduciary duty.").

Ohio law, however, does not impose a general obligation on majority shareholders that requires their actions to have a legitimate business purpose. Instead, majority shareholders are only obligated to demonstrate that their action had a legitimate business purpose *if* the action breached a fiduciary duty.  *See Crosby v. Beam*, 548 N.E.2d 217, 221 (Ohio 1989) ("Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their

36

own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent a legitimate business purpose, is actionable."). Stated differently, if a majority shareholder acts in a way that benefits all shareholders equally, the action does not violate a fiduciary obligation and the shareholder is not required to demonstrate a legitimate business purpose.[7]

The Appellants, in effect, argue that a substantial distribution violates the majority interest holder's fiduciary duties because it alters the character of the business. However, they have not cited any authority supporting this position. As previously discussed, ordering a distribution does not violate a majority interest holder's fiduciary obligations as long as the distribution is pro rata and benefits the minority interest holders equally. *Koos*, 641 N.E.2d at 271. Further, there is no indication that, under Ohio law, majority interest holders are not permitted to determine the direction of the business entity, as long as they do not provide unequal benefit to themselves in the process. To the contrary, *Koos* suggests that one of the defining features of possessing a majority interest is the ability to

---

[7]    The previously-cited cases upon which the Appellants rely are not to the contrary. In those cases in which the courts discussed whether the majority shareholder had a legitimate business purpose for its action, they did so because they had already found that the shareholder breached a fiduciary duty by taking an action that provided an unfair benefit. *See Kademian v. Marger*, 20 N.E.3d 1176 (Ohio Ct. App. 2014); *Hickerson v. Hickerson*, No. 5-10-08, 2010 WL 3385792 (Ohio Ct. App. Aug. 30, 2010); *Tablack v. Wellman*, No. 04-MA-218, 2006 WL 2590599 (Ohio Ct. App. Sept. 8, 2006); *Koos v. Cent. Ohio Cellular, Inc.*, 641 N.E.2d 265 (1994).

control the entity and minority interest holders cannot prevent the majority interest

holder from exercising this power. *See id*. Moreover, Ohio courts have recognized

that the heightened duty is not meant to protect potential future income for

minority interest holders. *Herbert v. Porter*, 845 N.E.2d 574, 578-79 (Ohio Ct.

App. 2006). Accordingly, Ohio law does not prevent a majority shareholder from

ordering the distribution of most of an entity's assets.

> *3. The Tax Court properly gave controlling weight to the Commissioner's expert regarding his methodology and valuation determination.*

The Appellants argue that the Tax Court clearly erred in adopting Burns's

methodology and valuation determination. They raise a number of arguments

concerning the Tax Court's evaluation of the two expert's conclusions. The

Appellants assert that Burns failed to consider a number of risk factors in his

methodology. They contend that, because of his failure to consider these factors,

the Tax Court should have "reject[ed] his testimony entirely."[8] The risks include

---

[8]    The Appellants point out that Burns did not speak to any member of CI LLC's management. However, they fail to indicate why speaking to management would be necessary or how it would have impacted his analysis. Additionally, they state that Burns's valuation at trial differed from his valuation in his initial report. The Appellants fail to cite persuasive authority requiring the Tax Court to disregard an expert who presents a different valuation at trial. They cite only to *Moore v. Comm'r*, 62 T.C.M. (CCH) 1128 (1991), in which the Tax Court identified numerous problems in the expert's testimony that led it to give little weight to his report, one of which being that his report and trial testimony were inconsistent in that they were based on significantly different methodologies. Here, the Tax Court was aware that the Commissioner's valuation of the asset had changed before trial. However, it did not feel that this change undermined confidence in Burns's valuation, based on the circumstances of the case.

38

CI LLC's: assumption of CIC's self-insurance obligations and associated risks; commitment to wind down CIC's obligations and associated risks; obligations under the Transition Services Agreement; assumption of CIC's environmental liabilities and associated risks; other contractual obligations to PepsiAmericas; employees; and CI LLC's transfer restrictions. The Appellants also argue that Burns's methodology was unsound because he based one end of his discount range on an academic study that measured only the illiquidity component of the discount.

The Appellants further contend that the Tax Court improperly disregarded Dr. Bajaj's opinion. They assert that Dr. Bajaj's regression analysis is a proven and scientifically-valid method for determining marketability. They argue that the Tax Court improperly reasoned that his analysis was inapplicable because it was based on 88 companies that primarily operated active businesses while the LLC consisted largely of liquid assets. They contend that the regression analysis accounts for those differences and still provides a comparable answer. Similarly, the Appellants claim that the Tax Court incorrectly disregarded Dr. Bajaj's analysis because the 88 companies had ownership interests of less than 50.50% when the same data had been used to determine the lack of marketability discounts for larger ownership interests. Finally, they allege that it is appropriate to

The Appellants have failed to indicate how the inconsistency demonstrates that Burns's methodology was unsound.

determine the lack of marketability discount based on analysis of large block transactions in restricted stock.

While the Tax Court discussed the specific details involved in each of the experts' methodology, its decision mainly turned on a larger issue. It concluded that a hypothetical seller would anticipate being able to force a distribution of the majority of the LLC's assets. Burns shared this view, and his ultimate valuation reflected this assumption. Dr. Bajaj did not hold this opinion. Similarly, his ultimate valuation opinion reflected the contrary assumption. This assumption is the fundamental reason that the Tax Court elected to adopt Burns's valuation over Dr. Bajaj's. The Appellants have failed to demonstrate that the Tax Court's decision regarding the expert testimony was erroneous because they fail to show that it was incorrect regarding this issue.

The Tax Court essentially viewed CI LLC as an asset holding company. The LLC consisted of only two operating businesses which accounted for only 4% of its total assets. Because operating businesses were a small fraction of its holdings, the LLC's value was based primarily on the value of its assets. As a result, the Tax Court concluded that the Trust's interest could not be valued at less than the amount that the interest would receive in a pro rata distribution of most of the LLC's assets. It stated that "[a] majority member who could force CI LLC to distribute most of its assets would not sell its membership interest for less than the

40

member's share of such a distribution." *Koons*, 105 T.C.M. (CCH) 1567. The Tax Court determined that the Trust's share of the distribution would be $140,000,000. *Id*. Because Dr. Dr. Bajaj's valuation was significantly less than this amount ($110,000,000), it concluded that his valuation could not possibly be an accurate determination of the price that a willing seller would sell his interest for and thus declined to adopt it. Conversely, Burns's valuation exceeded that amount. And because the Tax Court otherwise found that the valuation was consistent with its factual findings, it adopted Burns's determination.

The Tax Court's decision regarding the amount of the distribution depended on the value of the liabilities facing the LLC. The court made the factual determination that the $40,000,000 that the LLC was contractually-obligated to maintain at all times was designed, and more than sufficient, to cover the entirety of the LLC's obligations. The Appellants have failed to demonstrate that this conclusion was clearly erroneous.

The Appellants contend that the Tax Court reached this conclusion without any evidentiary support. However, the fact that the Tax Court did not specifically address each item of risk does not mean that it did not consider each one. The Tax Court conducted a trial in which evidence on these risks was presented. It specifically mentioned these issues in its description of the factual background of the case, demonstrating that it was aware of the risks. Its opinion suggests that it

41

considered these risks as a whole, and concluded that they did not exceed $40,000,000. Additionally, and more importantly, the Appellants do not cite any evidence showing that $40,000,000 was *not* adequate to cover LLC's risks. Beyond recitation of the risks, the Appellants fail to quantify them or otherwise give any indication that their value exceeded $40,000,000. In short, the Appellants have not cited anything to demonstrate or suggest that the Tax Court's determination that the value of CI LLC's risks did not exceed $40,000,000 was clear error.

The Appellants' defense of Dr. Bajaj's regression analysis also is unpersuasive. This analysis was based on companies that operate businesses; however, CI LLC was fundamentally an investment holding company. The LLC's value is based on the value of the distribution of most of the LLC's assets, while the regression analysis companies' values were based on the value of their operating companies. This is a fundamental difference between the LLC and the study's companies. For this reason among others, the Tax Court concluded that Dr. Bajaj's analysis was not appropriate to apply in the case before it. Although the regression analysis may be reliable as a general matter, the Tax Court had reason to conclude that it was not reliable as applied to the LLC. The Appellants have failed to demonstrate that it was error for the Tax Court to decline to rely on this valuation, methodology, and analysis.

## IV.

The Tax Court properly concluded that the subject loan (from CI LLC to pay the Estate's tax liability) was not a necessary expense. Additionally, it did not err in determining the fair market value of the Revocable Trust's interest in CI LLC. Accordingly, the Tax Court's judgment is **AFFIRMED**.